## PAULA J. FISH *v.* ANDREW J. FISH, JR.
## (SC 17500)

Borden, Norcott, Katz, Palmer, Vertefeuille, Zarella and Sullivan, Js.*

---

\* The listing of justices reflects their seniority status as of the date of oral argument.

This case originally was argued before a panel of this court consisting of Justices Norcott, Katz, Palmer, Vertefeuille and Zarella. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Accordingly, Justices Borden and Sullivan were added to the panel, and they have read the record, briefs and transcript of oral argument.

Argued September 18, 2006—officially released January 15, 2008

*Louis Kiefer,* for the appellant (defendant).

*Robert J. Kor,* with whom was *Emily J. Moskowitz,* for the minor child.

*Campbell D. Barrett, Steven R. Dembo* and *Justine Rakich-Kelly* filed a brief for the Children's Law Center as amicus curiae.

ZARELLA, J. In this postdissolution child custody proceeding, the issue before the court is whether a third party[1] must satisfy the jurisdictional pleading requirements and burden of persuasion articulated in *Roth* v. *Weston*, 259 Conn. 202, 234–35, 789 A.2d 431 (2002), when seeking the custody of a minor child over the objection of a fit parent.[2] The defendant, Andrew J. Fish, Jr., appeals from the judgment of the Appellate Court, which affirmed the order of the trial court modifying the original custody order[3] by awarding joint custody to the plaintiff, Paula J. Fish,[4] and the child's paternal aunt, intervenor Barbara Husaluk, and directing that the child's primary residence be with Husaluk in Aspen, Colorado. The defendant claims that the trial court lacked jurisdiction to grant Husaluk's motion to intervene and improperly awarded her custody because she failed to allege and prove by clear and convincing evidence the facts required by *Roth* for third party visitation. These facts include a relationship with the child akin to that of a parent and real and substantial emotional harm analogous to the harm required to prove that a child is "neglected, uncared-for or dependent"

---

[1] The term "third party" refers to any private individual other than a parent of the child, as distinguished from the state. We do not address situations in which the state seeks temporary custody of the child; see General Statutes § 46b-129; or removal of the child from the custody of the child's parents. See General Statutes § 45a-610.

[2] We granted the defendant's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that the trial court was not required to apply a heightened jurisdictional pleading requirement and burden of persuasion as required under *Roth* v. *Weston*, [supra, 259 Conn. 234–35]?" *Fish* v. *Fish*, 275 Conn. 924, 883 A.2d 1243 (2005).

[3] In its original order, the trial court awarded joint custody to the plaintiff and the defendant.

[4] The plaintiff is now known as Paula J. Pierce. The plaintiff did not submit a brief to this court. The guardian ad litem-attorney for the minor child submitted the only brief contesting the defendant's claim.

under the temporary custody and neglect statutes.[5] General Statutes § 46b-129; see also General Statutes § 46b-120; *Roth* v. *Weston*, supra, 234–35. We conclude that the pleading requirements and burden of proof that we articulated in *Roth* are not constitutionally mandated in third party custody proceedings, which present issues that are different from those raised in visitation proceedings. We also conclude, however, that the trial court improperly failed to apply a standard of harm more stringent than the "best interests of the child" when it granted Husaluk's motion to intervene and awarded her custody over the opposition of the defendant. Accordingly, we reverse in part[6] the judgment of the Appellate Court.

The following facts are set forth in the opinion of the Appellate Court. "The parties[7] were married on June 21, 1985, and a child was born of the marriage in 1989.[8]

---

[5] We note that *Roth* relied on the temporary custody and neglect statutes to define the level of *emotional* harm that the child would suffer should visitation with the petitioner be denied. See *Roth* v. *Weston*, supra, 259 Conn. 235. The *Roth* standard is therefore inadequate to evaluate the harm alleged in a third party custody proceeding because it does not contemplate the physical or psychological harm that also may form the basis of a third party custody award. Nevertheless, we assume, for purposes of this discussion, that the defendant and the concurrence refer to the physical, psychological and emotional harm described in the temporary custody and neglect statutes when they contend that the *Roth* standard should apply in third party custody proceedings.

[6] The Appellate Court concluded that the trial court had abused its discretion in ordering the allocation of tax dependency exemptions and, therefore, reversed the trial court's judgment only with respect to that order. *Fish* v. *Fish*, 90 Conn. App. 744, 764–65, 766, 881 A.2d 342 (2005). On appeal to this court, neither party has challenged the Appellate Court's determination of that issue. We therefore affirm that part of the Appellate Court's judgment.

[7] Throughout this opinion, we refer to the plaintiff and the defendant collectively as the "parties" or as the "parents."

[8] Although the parties' daughter turned eighteen on April 28, 2007, we agree with the defendant that his appeal would not be rendered moot by that fact in view of his unchallenged representation to this court that he may be entitled to favorable tax and other financial consequences should he prevail.

The marriage was dissolved on March 5, 1996, after which the parties shared joint custody of the child with an evenly divided parenting arrangement. There have been frequent contentious disputes with respect to the child's educational placement and the payment of tuition and child support. In June, 2001, a guardian ad litem was appointed for the child, and she continues to serve in that capacity as well as serving as the child's attorney since December, 2002.

"In May, 2002, [when the parties' daughter was thirteen years old] the defendant . . . [filed] a motion to modify custody in which he sought sole custody of the child with supervised visitation by the plaintiff. The court entered orders for a custody evaluation and ordered that the child live for the remainder of the school year with her maternal aunt, Pamela Martinsen, who lives in Connecticut. The court also ordered that the child spend the summer of 2002 in Aspen, Colorado, with her paternal aunt, Husaluk. In early December, 2002, there was another flurry of activity involving custody and visitation. The court ordered the temporary placement of the child with Martinsen and unsupervised weekend visitation by the parties on rotating weekends. Four days later, following an emergency request by the guardian ad litem, the court modified the visitation order to reflect that the child could elect the extent and the circumstances of her visitation with the defendant.

"Trial in this matter began on December 13, 2002, and continued on March 3, April 21, May 12, 19 and 29, and July 8, 2003. During the course of the trial, the guardian ad litem recommended that custody and placement of the child with Husaluk in Aspen, Colorado, would be in the child's best interest. The plaintiff, who had had a double mastectomy and was undergoing chemotherapy to treat her breast cancer throughout the trial, agreed with the guardian ad litem's proposed orders. Both Husaluk and Martinsen filed motions to

intervene during the course of the trial,[9] which the court granted. Following trial, the court ordered, inter alia, that Husaluk and the plaintiff share joint custody of the child, with the child's primary residence [to be] in Aspen, Colorado, with Husaluk during her high school years, which were about to commence. The court ordered visitation with each of the parties during school vacations . . . but specifically gave the child the choice of whether to spend overnight visits with the defendant. The court ordered that the guardian ad litem remain appointed to the child for four years 'should any issues arise . . . .'

"With respect to the custody of the child and its reasons for awarding joint custody to the plaintiff and Husaluk, the court made exhaustive findings of fact, which we excerpt and summarize from its August 1, 2003 memorandum of decision. Since the dissolution of the parties' marriage when the child was four years old, 'she has been the subject of an intense battle between the two parents over their ownership rights in her. She has, by her own account, constantly been "put in the middle," has been incessantly grilled by each parent after time spent with the other and has been bombarded by what she calls "guilt bombs" from each parent.'

"The court found that both parties had put their own interests before the child's well-being. In addition, the court found that the defendant had failed to provide a clean and appropriate home for the child, demonstrated

---

[9] In her motion to intervene, Husaluk stated: "I am the paternal aunt of the minor child . . . . By order of the court, [the child] resided with me during the summer of 2002. . . . I have maintained contact with [the child] throughout this school year. . . . [The child] spent her spring vacation with me, as ordered by the court. . . . I provide a safe and loving environment . . . for [the child]. . . . It is [the child's desire] to reside with me through her high school year[s]. Wherefore, I ask that the court grant me permission to intervene."

inappropriate behavior of a sexual nature in the child's presence, kept a dangerous dog in his home and, in sum, had emotionally neglected the child. The court stated: 'In the plaintiff's home, [the child] has had to endure her mother's attempts to make her feel guilty over the time spent at the defendant's home. In the defendant's home, she has had to deal with her father's incessant attempts to get her to his side. At his house, she also has been exposed to a filthy and unkempt environment, with multiple cats, cat feces and urine odors throughout the home.'

"The court also found that there was a history of conflict between the child and the defendant, and a history of inappropriate behavior by the defendant toward the child. For example, the court credited the child's testimony that the defendant walked around the house with an open bathrobe exposing his genitals in her presence and that he joked about going to a nudist colony with her. The defendant also made other inappropriate and suggestive comments, including once suggesting at a mall that she wear a 'see-through outfit.' The child also testified that the defendant, when angered, lost control of himself entirely, striking himself and running up and down stairs. She also testified that the defendant drank wine almost every day and that alcohol rendered his moods unpredictable. The child was adamant in her desire not to stay at the defendant's house overnight and expressed no desire to live with him.

"The court also found that after living with Martinsen and, later, Husaluk, the child had been away from her parents' battles and had seen how other people live in relative peace and in a supportive and nurturing environment. Those experiences increased the child's yearning for stability and calm in her family life, which she never had enjoyed with her parents. The court noted that, '[m]ost compelling, at one point during her testi-

mony, the child asked the court to please emancipate her.' The child's aunts, Martinsen and Husaluk, impressed the court as loving and nurturing women who have helped the child 'develop a voice for herself,' which she had lacked while in her parents' care. Martinsen, Husaluk, the plaintiff, the child and the guardian ad litem agreed that it was in the child's best interest that she live with Husaluk in Aspen. While in Aspen the previous summer, the child thrived, working at the Husaluk family business, participating in sports and making new friends. The defendant, in contrast to the child's aunts, refused to pay for the child's airplane ticket for her trip home because the child had refused to stay overnight at his house. Husaluk paid for the ticket.

"The court credited the testimony of John Herd, a teacher and administrator at the child's school in Connecticut, who testified that after returning from Aspen, the child's emotional state and the quality of her work in school improved. James Black, a child and adolescent psychiatrist who conducted an evaluation of the child and the parties, also recommended that the child return to Aspen to reside with Husaluk. Black testified that moving to Aspen would be the only thing that could insulate the child from the conflict that the parties have continued to wage and that, in all of his years of practice, he never had recommended sending a child away from her parents. Black recommended that it would be better for the child's development for her to stay with Husaluk with joint custody with the plaintiff than for her to attend a boarding school or to enter foster care, each of which the defendant had suggested.

"The court concluded that '[i]t is clear . . . that there exists a deep antagonism between the two parents that has little to do with [the child], which has caused them to place their own needs ahead of their daughter's. However, since the start of this case, the plaintiff's relationship with her daughter has improved consider-

ably. She has come to realize that her daughter's placement with [Husaluk] in Colorado for the next four years of high school is in the child's best interest. Unfortunately, the same cannot be said of the defendant. He is a controlling individual who believes that he is the only one qualified to decide what is in [the child's] best interest. . . . [H]e is incapable of working with the [plaintiff] or either of the aunts, including his own sister [Husaluk], to promote the child's best interest. . . . It is clear to this court that this child has been emotionally neglected by the defendant. He has had many opportunities and ample time to improve the condition of his home and has chosen not to. . . . The defendant does not hear his daughter and gives little credence to her opinions, ideas and needs. The court is persuaded that this fourteen year old is quite capable of making an intelligent, well thought out decision with respect to her living situation.' " *Fish* v. *Fish*, 90 Conn. App. 744, 747–52, 881 A.2d 342 (2005). The trial court thus concluded that it would be in the child's best interests to award joint custody to the plaintiff and Husaluk.

In its subsequent orders, the court directed that the plaintiff and Husaluk consult with the defendant regarding "all major events affecting the child's life," with Husaluk having final decision-making authority. The court also directed that the child return to Connecticut for school vacations and for one month during the summer. The court further ordered: "It is . . . expected that when the child visits Connecticut, she shall be encouraged to spend equal time with each of her parents . . . . However, [due to] . . . concerns about the physical condition of the defendant's home and the dog, it shall be the child's decision whether she chooses to spend overnights with her father." The court ordered the plaintiff and the defendant to share the cost of transporting the child to and from Connecticut and stated that "[t]here shall be reasonable telephone and e-mail contact between the child and her parents. It is

hoped that both parents shall continue to have a full and active role in providing a sound ethical, economic, and educational environment for the child when she is in their care. . . . The parents shall exert their best efforts to work cooperatively with [Husaluk] to develop future plans for the child consistent with the best interests of the child and to amicably resolve such disputes as may arise from time to time."

On appeal to the Appellate Court, the defendant claimed, inter alia, that the trial court lacked jurisdiction over Husaluk's motion to intervene and improperly awarded her custody because she had failed to satisfy the heightened pleading requirements and burden of persuasion set forth in *Roth*. *Fish* v. *Fish*, supra, 90 Conn. App. 752. The defendant argued that the *Roth* standard should apply to third party intervention petitions and custody awards because custody intrudes on the rights of a fit parent at least as much as visitation. See id., 756. The Appellate Court disagreed on the ground that the visitation standard was intended to impose additional requirements so as to avoid invalidating the overly broad visitation statute[10] on constitutional grounds, whereas the defendant in the present case had not challenged the relevant custody statutes, in particular, General Statutes § 46b-56b,[11] as unconstitutional. See id. The court further noted that the para-

---

[10] General Statutes § 46b-59 provides in relevant part: "The Superior Court may grant the right of visitation with respect to any minor child or children *to any person*, upon an application of such person. Such order shall be according to the court's best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable . . . . In making, modifying or terminating such an order, the court shall be guided by the best interest of the child, giving consideration to the wishes of such child if he is of sufficient age and capable of forming an intelligent opinion. . . ." (Emphasis added.)

[11] General Statutes § 46b-56b provides: "In any dispute as to the custody of a minor child involving a parent and a nonparent, there shall be a presumption that it is in the best interest of the child to be in the custody of the parent, which presumption may be rebutted by showing that it would be detrimental to the child to permit the parent to have custody."

mount concern in *Roth* was the right of a fit parent to raise a child free from interference by others; id., 756; but that the principal concern in custody cases is the "best interest of the child." (Internal quotation marks omitted.) Id., 757. The court thus concluded that, although "the defendant enjoys the rights of a parent recognized in *Roth* and other cases, the jurisdictional pleading requirements and heightened burden of persuasion of *Roth*, which are specific to cases involving third party petitions for visitation over the objection of a fit parent, are inapposite to this contested custody case . . . ." Id., 752. The Appellate Court finally observed that the trial court had determined that it was in the child's best interest to award joint custody to the plaintiff and Husaluk pursuant to the governing custody statutes, namely, General Statutes §§ 46b-57,[12] 46b-56[13]

[12] General Statutes § 46b-57 provides: "In any controversy before the Superior Court as to the custody of minor children, and on any complaint under this chapter or section 46b-1 or 51-348a, if there is any minor child of either or both parties, the court, if it has jurisdiction under the provisions of chapter 815p, may allow any interested third party or parties to intervene upon motion. The court may award full or partial custody, care, education and visitation rights of such child to any such third party upon such conditions and limitations as it deems equitable. Before allowing any such intervention, the court may appoint counsel for the child or children pursuant to the provisions of section 46b-54. In making any order under this section, the court shall be guided by the best interests of the child, giving consideration to the wishes of the child if the child is of sufficient age and capable of forming an intelligent preference."

[13] General Statutes § 46b-56 provides in relevant part: "(a) In any controversy before the Superior Court as to the custody or care of minor children, and at any time after the return day of any complaint under section 46b-45, the court may make or modify any proper order regarding the custody, care, education, visitation and support of the children if it has jurisdiction under the provisions of chapter 815p. Subject to the provisions of section 46b-56a, the court may assign parental responsibility for raising the child to the parents jointly, or may award custody to either parent or to a third party, according to its best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable. The court may also make any order granting the right of visitation of any child to a third party to the action, including, but not limited to, grandparents.

"(b) In making or modifying any order as provided in subsection (a) of this section, the rights and responsibilities of both parents shall be consid-

and 46b-56b. The Appellate Court thus concluded that

ered and the court shall enter orders accordingly that serve the best interests of the child and provide the child with the active and consistent involvement of both parents commensurate with their abilities and interests. Such orders may include, but shall not be limited to: (1) Approval of a parental responsibility plan agreed to by the parents . . . (2) the award of joint parental responsibility of a minor child to both parents, which shall include (A) provisions for residential arrangements with each parent in accordance with the needs of the child and the parents, and (B) provisions for consultation between the parents and for the making of major decisions regarding the child's health, education and religious upbringing; (3) the award of sole custody to one parent with appropriate parenting time for the noncustodial parent where sole custody is in the best interests of the child; or (4) any other custody arrangements as the court may determine to be in the best interests of the child.

"(c) In making or modifying any order as provided in subsections (a) and (b) of this section, the court shall consider the best interests of the child, and in doing so may consider, but shall not be limited to, one or more of the following factors: (1) The temperament and developmental needs of the child; (2) the capacity and the disposition of the parents to understand and meet the needs of the child; (3) any relevant and material information obtained from the child, including the informed preferences of the child; (4) the wishes of the child's parents as to custody; (5) the past and current interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (6) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (7) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (8) the ability of each parent to be actively involved in the life of the child; (9) the child's adjustment to his or her home, school and community environments; (10) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (11) the stability of the child's existing or proposed residences, or both; (12) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child; (13) the child's cultural background; (14) the effect on the child of the actions of an abuser, if any domestic violence has occurred between the parents or between a parent and another individual or the child; (15) whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120; and (16) whether the party satisfactorily completed participation in a parenting education

the trial court properly had declined to apply the standard articulated in *Roth*. Id., 757.

In his appeal to this court, the defendant renews his claim that the trial court improperly failed to apply the visitation standard to Husaluk's motion to intervene and to the modified award of custody. We agree with the defendant that third party custody decisions require the application of a standard more demanding than the "best interests of the child." We nonetheless conclude that the judicial gloss we placed on the visitation statute in *Roth* should not be applied to the relevant third party custody statutes because it is not constitutionally necessary to protect the liberty interests of the parents. The *Roth* standard also gives insufficient weight to the countervailing interests of the child, who may not be in actual physical danger but may be destined to endure continued harmful treatment by the parent if the trial court lacks adequate flexibility and discretion to tailor orders of custody to the unique facts of each case. Finally, it contravenes the intent of the legislature, which did not contemplate a standard of harm or burden of proof for third party custody proceedings as demanding as the standard articulated in *Roth*.

I

The trial court's determination of the proper legal standard in any given case is a question of law subject to our plenary review. See, e.g., *Hartford Courant Co. v. Freedom of Information Commission*, 261 Conn. 86, 96–97, 801 A.2d 759 (2002).

We begin our analysis by examining the reasoning in *Roth*, in which the trial court granted the petitioners,

program established pursuant to section 46b-69b. The court is not required to assign any weight to any of the factors that it considers. . . ."

Although § 46b-56 was amended in 2005; see Public Acts 2005, No. 05-258, § 3; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of § 46b-56 throughout this opinion.

the maternal grandmother and maternal aunt, visitation with the defendant's two minor children following their mother's death. See *Roth* v. *Weston*, supra, 259 Conn. 204. In his appeal to this court, the defendant in *Roth* argued that, in light of the United States Supreme Court's decision in *Troxel* v. *Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), the Connecticut visitation statute, which provides that the court may grant the right of visitation "with respect to any minor child or children to any person, upon an application of such person . . . according to the court's best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable"; General Statutes § 46b-59; was either facially unconstitutional or unconstitutional as applied to the facts of the case. *Roth* v. *Weston*, supra, 205. We agreed that this state's visitation statute, like the Washington visitation statute at issue in *Troxel*,[14] "[did] not adequately acknowledge the status of parents' interest in the care, custody and control of their children, as perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court." (Internal quotation marks omitted.) Id., 216, quoting *Troxel* v. *Granville*, supra, 65. Nevertheless, rather than invalidating the statute, we searched for a construction that would accomplish the legislature's purpose and declared that a court could exercise jurisdiction over a petition for third party visitation against the wishes of a fit parent only if the petition contains "specific, good faith allegations that the petitioner has a relationship with the child that is similar in nature to a parent-child relationship. The petition must also contain specific, good faith allegations that denial of the visitation will cause real and

---

[14] In *Troxel*, the United States Supreme Court concluded that the Washington visitation statute was unconstitutional as applied in that case because it was overly broad and accorded no special deference to the custodial parent's decision that the requested visitation was not in her daughter's best interests. See *Troxel* v. *Granville*, supra, 530 U.S. 67.

significant [emotional] harm to the child. As we have stated, that degree of harm requires more than a determination that visitation would be in the child's best interest. It must be a degree of harm analogous to the kind of harm contemplated by §§ 46b-120 and 46b-129,[15] namely, that the child is 'neglected, uncared-for or dependent.'[16] The degree of specificity of the allegations must be sufficient to justify requiring the fit parent to subject his or her parental judgment to unwanted litigation. Only if these specific, good faith allegations are made will a court have jurisdiction over the petition.

"Second, once these high jurisdictional hurdles have been overcome, the petitioner must prove these allegations by clear and convincing evidence. Only if that enhanced burden of persuasion has been met may the court enter an order of visitation. These requirements thus serve as the constitutionally mandated safeguards against unwarranted intrusions into a parent's authority." *Roth* v. *Weston*, supra, 259 Conn. 234–35.

The defendant's claim that the trial court should have applied the heightened standard in *Roth* to Husaluk's motion to intervene and to its custody award implies that the custody statutes are facially unconstitutional and that any lesser standard is insufficient to protect the defendant's constitutional rights. Accordingly, although he did not frame his claim in constitutional language, it is essentially constitutional in nature. We therefore examine the relevant custody statutes to determine

[15] General Statutes § 46b-129 (a) provides that children who are deemed "neglected, uncared-for or dependent" may be removed temporarily from their parents' custody and committed to the temporary care and custody of some other suitable agency or person.

[16] We explained in *Roth* that such a situation would occur in the visitation context when "a person has acted in a parental-type capacity for an extended period of time, becoming an integral part of the child's regular routine, [such] that [the] child could suffer serious harm should contact with that person be denied or so limited as to seriously disrupt that relationship." *Roth* v. *Weston*, supra, 259 Conn. 225–26.

whether they provide fit parents who oppose third party custody petitions with sufficient protection to survive a constitutional challenge and, if not, whether § 46b-56b, in particular, should be subject to the same judicial gloss that we placed on the visitation statute at issue in *Roth.*

## II

In discussing the constitutional basis for the protection of parental rights, the United States Supreme Court observed in *Troxel* that "[t]he liberty interest . . . of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this [c]ourt. More than [seventy-five] years ago, in *Meyer* v. *Nebraska*, 262 U.S. 390, 399, 401 [43 S. Ct. 625, 67 L. Ed. 1042] (1923), we held that the liberty protected by the [d]ue [p]rocess [c]lause includes the right of parents to establish a home and bring up children and to control the education of their own. Two years later, in *Pierce* v. *Society of Sisters*, 268 U.S. 510, [534–35, 45 S. Ct. 751, 69 L. Ed. 1070] (1925), we again held that the liberty of parents and guardians includes the right to direct the upbringing and education of children under their control. . . . We returned to the subject in *Prince* v. *Massachusetts*, 321 U.S. 158 [64 S. Ct. 438, 88 L. Ed. 645] (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. It is cardinal . . . that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. Id., [166]." (Citation omitted; internal quotation marks omitted.) *Troxel* v. *Granville*, supra, 530 U.S. 65–66. "In light of this extensive precedent, it cannot now be doubted that the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment protects the fundamental right of parents

to make decisions concerning the care, custody, and control of their children." Id., 66.

Connecticut courts likewise have recognized the constitutionally protected right of parents to raise and care for their children. See, e.g., *Denardo* v. *Bergamo*, 272 Conn. 500, 511, 863 A.2d 686 (2005); *Crockett* v. *Pastore*, 259 Conn. 240, 246, 789 A.2d 453 (2002); *Roth* v. *Weston*, supra, 259 Conn. 216; *In re Baby Girl B.*, 224 Conn. 263, 279–80, 618 A.2d 1 (1992). When legislation affects a fundamental constitutional right, it must be strictly scrutinized. See, e.g., *Roth* v. *Weston*, supra, 218; *Castagno* v. *Wholean*, 239 Conn. 336, 344, 684 A.2d 1181 (1996), overruled on other grounds by *Roth* v. *Weston*, supra, 202. We therefore study the pertinent custody statutes to determine whether they are narrowly tailored to achieve a compelling state interest. See *Roth* v. *Weston*, supra, 218; see also *Keogh* v. *Bridgeport*, 187 Conn. 53, 66, 444 A.2d 225 (1982) ("[w]hen a statutory classification . . . affects a fundamental personal right, the statute is subject to strict scrutiny and is justified only by a compelling state interest"). This requires consideration of standing, the standard of harm that the trial court must apply in deciding third party intervention petitions and custody awards, and the proper burden of proof.

### III

We repeatedly have recognized that when "fundamental rights are implicated . . . standing serves a function beyond a mere jurisdictional prerequisite. It also ensures that the statutory scheme is narrowly tailored so that a person's personal affairs are not needlessly intruded upon and interrupted by the trauma of litigation."[17] *Roth* v. *Weston*, supra, 259 Conn. 219.

---

[17] We note that third party custody petitions may be filed only when there is an existing controversy before the Superior Court. See General Statutes §§ 46b-56 (a) and 46b-57. Thus, they do not create additional litigation to which the parents must respond. Visitation petitions, on the other hand, may be filed at any time by a person who has a parent-like relationship

Accordingly, a strict scrutiny analysis requires that the statutory scheme be narrowly drawn with respect to the class of persons who may seek to intervene in a custody proceeding or to whom custody may be awarded by the court.[18] See id.

Three statutes govern third party custody determinations. General Statutes § 46b-56 (a) provides that, in making or modifying an order of custody, the court may award custody to "either parent or to a third party . . . ." Additionally, General Statutes § 46b-57 provides that the trial court "may allow any interested third party or parties to intervene upon motion" in any existing custody proceeding and "may award full or partial custody . . . of such child to any such third party . . . ." Finally, General Statutes § 46b-56b provides that, in disputes regarding "the custody of a minor child involving a parent and a nonparent," there shall be a rebuttable presumption that it is in the best interest of the child for the parent to retain custody unless such custody is shown to be "detrimental" to the child.

The term "third party" is not defined in the foregoing statutes or in any other related statutes. The legislative

with the child. *Roth* v. *Weston*, supra, 259 Conn. 221–22; see General Statutes § 46b-59.

[18] Section 46b-57 authorizes the formal intervention of an interested third party whose interest may not already be before the court in an existing controversy, thus serving as a procedural supplement to § 46b-56, which does *not* require a third party to intervene in order for the court to award custody to that party. See *Doe* v. *Doe*, 244 Conn. 403, 441, 710 A.2d 1297 (1998); see also *Cappetta* v. *Cappetta*, 196 Conn. 10, 14–15, 490 A.2d 996 (1985) (although "orderly adjudication of the custody claims of nontraditional parties is best managed by having such claimants become party intervenors at the earliest possible appropriate time," statutory scheme permits award of custody to nonparty "if, even without formal intervention, that person's potential custodial status was properly before the court"). Accordingly, when a third party seeks to intervene in a custody proceeding, he or she must allege the same facts that the court must find when awarding custody to a third party who has not intervened in the proceeding but whose interest has been brought before the court in some other manner.

history of the statutes sheds no additional light on the matter. As we stated in *Castagno*, "courts are bound to assume that the legislature intended, in enacting a particular law, to achieve its purpose in a manner which is both effective and constitutional. . . . [T]his presumption of constitutionality imposes upon the trial court, as well as this court, the duty to construe statutes, whenever possible, in a manner that comports with constitutional safeguards of liberty." (Citation omitted; internal quotation marks omitted.) *Castagno* v. *Wholean*, supra, 239 Conn. 344–45.

When construing similarly broad language concerning third party visitation in *Roth*, we noted that the 1983 amendment to the visitation statute extending standing to "any person";[19] Public Acts 1983, No. 83-95; reflected "the legislature's recognition that persons other than parents may have substantial relationships with children that warrant preservation." *Roth* v. *Weston*, supra, 259 Conn. 220. We also recognized that, "in many households, grandparents, as well as people who have no biological relationship with a child, undertake duties of a parental nature and that states have sought to ensure the welfare of children by protecting those relationships. Some states have done this expressly . . . while others have done so by judicial gloss. . . .

"Therefore, we acknowledge that a person other than a blood relation may have established a more significant connection with a child than the one established with a grandparent or some other relative. Conversely, we recognize that being a blood relation of a child does not always translate into that relative having significant emotional ties with that child. Indeed, as § 46b-59 implicitly recognizes, it is not necessarily the biological

---

[19] General Statutes § 46b-59 provides in relevant part: "The Superior Court may grant the right of visitation with respect to any minor child or children to any person, upon an application of such person. . . ."

aspect of the relationship that provides the basis for a legally cognizable interest. Rather, it is the nature of the relationship that determines standing." (Citations omitted.) Id., 220–21.

We thus concluded in *Roth* that, "in light of the presumption of parental fitness under *Troxel,* parents should not be faced with unjustified intrusions into their decision-making in the absence of . . . proof of a [parent-like] relationship . . . . The extension of statutory rights to persons other than a child's parents comes with an obvious cost. *Troxel* v. *Granville,* supra, 530 U.S. 64. Proof of the nature of a parent-like relationship between a person seeking visitation and the child would provide the jurisdictional safeguard necessary to prevent families from having to defend against unjustified petitions for visitation. Accordingly, any third party . . . seeking visitation must allege and establish a parent-like relationship as a jurisdictional threshold in order both to pass constitutional muster and to be consistent with the legislative intent." (Citation omitted.) *Roth* v. *Weston,* supra, 259 Conn. 221–22.

The relevant statutes concerning visitation and custody are overly broad in exactly the same fashion; they fail to define with particularity those persons who may seek visitation and custody other than parents. For this reason, as in the case of visitation, a literal application of the custody statutes could place them in "constitutional jeopardy." *Castagno* v. *Wholean,* supra, 239 Conn. 345. Accordingly, we conclude that, to avoid constitutional infirmity, the standing requirement that a third party allege a parent-like relationship with the child should be applied for all of the reasons described in *Roth* to third party custody awards and to third parties seeking intervention in existing custody proceedings.

## IV

### A

We next consider the harm that a third party must allege and prove to intervene in a custody proceeding or that the trial court must find to justify a third party custody award over the objection of a fit parent. We first note that third party custody disputes differ from those in which both parents seek custody because, in the latter case, each party possesses a constitutionally protected parental right. See *McDermott* v. *Dougherty*, 385 Md. 320, 353, 869 A.2d 751 (2005). In cases in which both parents seek custody, "[n]either parent has a superior claim to the exercise of [the] right to provide care, custody, and control of the children. . . . Effectively, then, each fit parent's constitutional right neutralizes the other parent's constitutional right, leaving, generally, the best interests of the child as the *sole standard* to apply to these types of custody decisions. Thus, in evaluating each parent's request for custody, the parents commence as presumptive equals and a trial court undertakes a balancing of each parent's relative merits to serve as the primary custodial parent; the child's best interests [tip] the scale in favor of an award of custody to one parent or the other.

"Where the dispute is between a fit parent and a private third party, however, both parties do not begin on equal footing in respect to rights to care, custody, and control of the children.[20] The parent is asserting a fundamental constitutional right. The third party is not. A private third party has no fundamental constitutional right to raise the children of others. Generally, absent a constitutional statute, the non-governmental third party

---

[20] In the present case, the trial court assigned joint custody to the mother and the paternal aunt. The analysis that follows, however, applies to all situations in which third parties seek custody of a minor child, regardless of the custodial arrangement that the court ultimately orders.

has no rights, constitutional or otherwise, to raise someone else's child." (Citation omitted; emphasis in original; internal quotation marks omitted.) Id.

Mindful of the parent's constitutional rights, we concluded in *Roth* that Connecticut's third party visitation statute, without a judicial gloss, was unconstitutional and interfered with the fundamental right of parents to raise and care for their children because it was too broadly written and provided no standard to guide the court in making a visitation decision, other than the best interests of the child. *Roth* v. *Weston*, supra, 259 Conn. 222–23. We specifically noted that the visitation statute, *on its face*, both "ignore[d] the presumption that parents act in the best interests of their children" *and* "allow[ed] parental rights to be invaded by judges based solely [on] the judge's determination that the child's best interests would be better served if the parent exercised his parental authority differently." Id. Section 46b-56b does not suffer from either of these deficiencies. Inclusion in the statute of a rebuttable presumption[21] in favor of parental custody addresses the constitutional flaw that contributed to the defeat of the Washington visitation statute at issue in *Troxel* and that prompted this court, in part, to place a judicial gloss on § 46b-59. See *Troxel* v. *Granville*, supra, 530 U.S. 72–73; *Roth* v. *Weston*, supra, 232–35. General Statutes § 46b-56b also provides that the presumption may be rebutted only by demonstrating that parental custody would be "detrimental to the child . . . ." The rebutta-

---

[21] "A rebuttable presumption is equivalent to prima facie proof of a fact and can be rebutted only by the opposing party's production of sufficient and persuasive contradictory evidence that disproves the fact that is the subject of the presumption. . . . A presumption requires that a particular fact be deemed true until such time as the proponent of the invalidity of the fact has, by the particular quantum of proof required by the case, shown by sufficient contradictory evidence, that the presumption has been rebutted." (Citation omitted.) *Schult* v. *Schult*, 40 Conn. App. 675, 684, 672 A.2d 959 (1996), aff'd, 241 Conn. 767, 699 A.2d 134 (1997).

ble presumption and the standard of harm articulated in the third party custody statute thus protect parental rights because they preclude the court from awarding custody on the basis of a purely subjective determination of the child's best interests or the judge's personal or lifestyle preferences. As a result, we conclude that the statute is facially constitutional.

The defendant nonetheless argues that the standard of harm articulated in *Roth* should apply in third party custody proceedings because *Roth* declared that "[v]isitation is a limited form of custody during the time the visitation rights are being exercised . . . ." (Internal quotation marks omitted.) *Roth* v. *Weston*, supra, 259 Conn. 229 n.13. This comparison is overly simplistic, however, because it improperly focuses on the time that the child is away from the parent and does not consider that third party visitation and custody intrude on the parental liberty interest in entirely different ways. Specifically, visitation petitions challenge the decision of a fit parent who is presumed to be acting in the child's best interest to deny or limit the petitioner's request for visitation. See *Troxel* v. *Granville*, supra, 530 U.S. 72–73. The harm alleged in a visitation petition results from the child's lack of access to the petitioner rather than from the parent-child relationship, which is deemed to be beneficial. See *In re Juvenile Appeal (84-AB)*, 192 Conn. 254, 263, 471 A.2d 1380 (1984). In contrast, the harm alleged in a third party custody petition arises from the fundamental nature of the parent-child relationship, which may be emotionally, psychologically or physically damaging to the child. Consequently, in light of the fact that a third party custody petition *directly challenges* the overall competence of the parent to care for the child, the standard employed to protect the liberty interest of the parent must be more flexible and responsive to the child's welfare than the standard applied in visitation cases,

in which the underlying parent-child relationship is not contested.[22] See *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 287, 455 A.2d 1313 (1983) (when "the child's interest no longer coincides with that of the parent . . . the magnitude of the parent's right to family integrity" is diminished). These considerations weigh against the application of the *Roth* standard of harm in third party custody proceedings because the requirements articulated in *Roth* provide insufficient room for the judicial discretion necessary to formulate solutions that take into account the unique facts and circumstances of each particular case.

In addition, when this court had the opportunity to interpret the meaning of detriment to the child in a related context, it did not adopt a construction as restrictive as the standard of harm set forth in *Roth*. In *In re Joshua S.*, 260 Conn. 182, 184, 796 A.2d 1141 (2002), the rights of the named testamentary guardians of a neglected child were challenged by the department of children and families (department) and by the child's foster parents following the death of the child's natural parents. On appeal, we considered whether the department and the foster parents, to whom the trial court had awarded custody, had rebutted the presumption that appointment of the testamentary guardians would be in the child's best interest, which required a finding

---

[22] The concurrence notes that, because *Roth* requires proof of a level of emotional harm akin to that contemplated under the temporary custody and neglect statutes, namely, harm that would arise because the child is neglected, uncared-for or dependent; General Statutes §§ 46b-120 and 46b-129; "one reasonably cannot say that the parent's competency is not at issue in visitation petitions." We disagree. The competence of the parent to make a visitation decision does not directly implicate the parent's underlying relationship with the child. Cf. *Roth* v. *Weston*, supra, 259 Conn. 206 (plaintiffs alleged visitation was in best interests of children but did not allege defendant was unfit parent). Consequently, the concurrence's suggestion that third party visitation and custody petitions raise similar questions regarding parental competency reflects a fundamental misunderstanding of the different interests at stake in visitation and custody proceedings.

that it would be "detrimental" to the child to grant custody to the testamentary guardians. See id., 199. Noting that the standard of detriment employed in testamentary guardianship cases had been *imported directly from § 46b-56b*; see id., 201–202, citing *Bristol* v. *Brundage*, 24 Conn. App. 402, 406, 589 A.2d 1 (1991); we ultimately determined that "detriment may be shown, not just by demonstrating unfitness of the testamentary guardian . . . but by demonstrating conditions that would be damaging, injurious or harmful to the child." *In re Joshua S.*, supra, 207.

Other jurisdictions that utilize the detriment to the child standard in deciding third party custody petitions also rely on a less restrictive interpretation of the concept so as to give the court sufficient flexibility and discretion to address the unique and complicated circumstances that distinguish such cases. See *Turner* v. *Pannick*, 540 P.2d 1051, 1054 (Alaska 1975) ("the nonparent must show that it clearly would be detrimental to the child to permit the parent to have custody"); *In re Guardianship of D.A.McW.*, 460 So. 2d 368, 370 (Fla. 1984) ("custody should be denied to the natural parent only when such an award will, in fact, be detrimental to the welfare of the child"); *Bateman* v. *Johnson*, 818 So. 2d 569, 571 (Fla. App. 2002) ("[t]o deny a parent custody of his child based on a finding of detriment, the change in custody would have to be likely to produce mental, physical, or emotional harm of a lasting nature" [internal quotation marks omitted]); *McDermott* v. *Dougherty*, supra, 385 Md. 325 ("the trial court must first find . . . that extraordinary circumstances exist which are significantly detrimental to the child remaining in the custody of the parent or parents, before a trial court should consider the 'best interests of the child' standard as a means of deciding the dispute"). In *In re Marriage of Allen*, 28 Wash. App. 637, 645–46, 626 P.2d 16 (1981), the Washington Court of Appeals observed that a bal-

ancing test more stringent than the "best interests of the child" was required to justify an award of custody to a nonparent. The court specifically concluded that, although great deference must be accorded to the constitutionally protected rights of parents; id., 646; those rights are not absolute and must yield to the fundamental rights of the child or important interests of the state in certain situations, as when "circumstances are such that the child's growth and development would be detrimentally affected by placement with an otherwise fit parent . . . ." Id., 647. The court further declared: "In extraordinary circumstances, [in which] placing the child with an otherwise fit parent would be detrimental to the child, the parent's right to custody is outweighed by the [s]tate's interest in the child's welfare. There must be a showing of actual detriment to the child, something greater than the comparative and balancing analyses of the 'best interests of the child' test. Precisely what might outweigh parental rights must be determined on a case-by-case basis. But unfitness of the parent need not be shown." Id., 649.

A Louisiana appeals court construing former article 146 (B) of the Louisiana Civil Code, which provided that the court must find that parental custody would be detrimental to the child before awarding custody to a third party without parental consent, likewise declared that it was reasonable to assume that the legislature intended the standard to place greater emphasis on the welfare of the child and that the term detriment had been construed by other Louisiana courts as requiring a finding that that the child would experience "substantial harm" if returned to the parent. (Internal quotation marks omitted.) *Pittman* v. *Jones*, 559 So. 2d 990, 993 (La. App.), cert. denied, 565 So. 2d 451 (La. 1990). The court also observed that the concept of detriment in Louisiana was intended to embrace a wide range of

situations so as to give the court sufficient freedom to craft an appropriate solution. See id.

When the California legislature enacted a similar statute providing that the court must "make a finding that an award of custody to a parent would be detrimental to the child"; (internal quotation marks omitted) *In re B. G.*, 11 Cal. 3d 679, 697, 523 P.2d 244, 114 Cal. Rptr. 444 (1974); the judiciary committee explained that, "[w]hat is detrimental has not been set forth with particularity. It is a nearly impossible task to devise detailed standards which will leave the courts sufficient flexibility to make the proper judgment in all circumstances . . . . *The important point is that the intent of the [l]egislature is that the court consider parental custody to be highly preferable. Parental custody must be clearly detrimental to the child before custody can be awarded to a nonparent.*" (Emphasis in original.) Id., 698.

Many of the same jurisdictions have cautioned, however, that third party custody awards should be granted only sparingly. In its subsequent interpretation of the statute, the California Supreme Court emphasized that, although the legislature had changed the parental preference doctrine from its former focus on parental unfitness to its present focus on detriment to the child, the legislature had not intended to change the judicial practice of awarding custody to a nonparent "only in unusual and extreme cases." Id. The court stated that custody would be awarded "to a nonparent against the claim of a parent only upon a clear showing that such [an] award is essential to avert harm to the child. A finding that such an award will promote the 'best interests' or the 'welfare' of the child will not suffice." Id., 699.

None of the foregoing jurisdictions has attempted to define detriment to the child more precisely, because

to do so would limit a court's ability to weigh and balance the numerous factors that a court ordinarily must consider in making a finding of harm. See, e.g., id., 698. Nevertheless, most jurisdictions that employ a broader standard have observed that third party custody awards should be exceptional in nature and that the concept of detriment involves a type of analysis qualitatively different from that involving the "best interests of the child," a conclusion with which we agree. See, e.g., *Evans* v. *McTaggart*, 88 P.3d 1078, 1079, 1085 (Alaska 2004); *Murphy* v. *Markham-Crawford*, 665 So. 2d 1093, 1094 (Fla. App. 1995), review denied, 675 So. 2d 928 (1996); *Clark* v. *Wade*, 273 Ga. 587, 598–99, 544 S.E.2d 99 (2001); *Stockwell* v. *Stockwell*, 116 Idaho 297, 299–300, 775 P.2d 611 (1989); *Watkins* v. *Nelson*, 163 N.J. 235, 252–54, 748 A.2d 558 (2000); *Bailes* v. *Sours*, 231 Va. 96, 100, 340 S.E.2d 824 (1986); *In re Custody of Shields*, 157 Wash. 2d 126, 144–45, 136 P.3d 117 (2006).

The legislative history of § 46b-56b also reveals that the General Assembly rejected the more explicit standard of harm required for removal of the parent as guardian, which is similar to the type of harm that must be demonstrated under the temporary custody and neglect statutes, so that the court may give more weight to the child's welfare in determining whether a petitioner has rebutted the presumption in favor of parental custody.[23] In fact, the House of Representa-

[23] Although the legislative history of § 46b-56b has no bearing on the constitutional issue, it provides useful guidance in determining the legislature's intent regarding the standard of harm that it wished to impose in third party custody disputes. The proposed legislation originally was presented to the House of Representative's in Substitute House Bill No. 5122. That bill provided in relevant part: "In a dispute between a natural parent and nonparent, the court shall recognize a superior right to custody in the natural parent, unless the non-parent, by clear and convincing evidence, establishes grounds which would authorize the removal of the natural parent as guardian under [General Statutes (Rev. to 1985) § 45-44c, now General Statutes § 45a-610]." Substitute House Bill No. 5122, 1985 Sess. The bill thus required a nonparent to prove the same facts required for removal of a parent as

## tive's amended the original third party custody bill for

guardian when the parent does not consent, namely: (1) abandonment of the child in the sense that the parent has failed to maintain a reasonable degree of concern or responsibility for the child's welfare; (2) evidence of child abuse or unexplained injuries; or (3) lack of parental care, guidance or control necessary for the child's physical, emotional, educational or moral well-being, either because the parent is physically or mentally incapable or because of habit, misconduct or neglect, thereby indicating that the parent either cannot, or in the child's best interest should not, be permitted to be a parent at that time. See General Statutes (Rev. to 1985) § 45-44c.

After the bill was introduced in the House, the language was revised to emphasize the best interests of the child. The House also replaced the language referring to the standard for removal of a parent as guardian with less restrictive language referring to detriment to the child. The revised bill provided: "In any dispute as to the custody of minor children involving a parent and a non-parent, there shall be a presumption that it is in the best interest of the child to be in the custody of the parent, unless it is shown, by clear and convincing evidence, that it would be detrimental to the child to permit the parent to have custody."

During the Senate's consideration of the revised bill, discussion initially centered on whether the best interests of the child would be adequately protected if a presumption was created in favor of the parent. See 28 S. Proc., Pt. 5, 1985 Sess., pp. 1751–60. Those opposing the bill were concerned that such a presumption would be difficult to rebut. Id., pp. 1760, 1762. The bill failed to gain sufficient support and was defeated; id., p. 1763; but a motion for reconsideration was passed the following day. 28 S. Proc., Pt. 6, 1985 Sess., p. 1774. Upon reconsideration, the Senate adopted an amendment removing all language pertaining to the standard required to rebut the presumption and the burden of proof. See 28 S. Proc., Pt. 7, 1985 Sess., p. 2231, remarks of Senator Richard B. Johnston. The bill then provided: "In any dispute as to the custody of minor children involving a parent and a non-parent, there shall be a presumption that it is in the best interest of the child to be in the custody of the parent."

In the debate that followed as to what would be required to overcome this presumption, Senator Anthony V. Avallone summarized the position of the bill's proponents, stating: "The original bill and the amendment are really quite different. The original bill indicated that there would be a presumption that the non-parent would have the burden of establishing by clear and convincing evidence that there was a detriment or there was not a detriment to the child by staying or going with the natural parent. What this bill does is merely say that the natural parent would have a presumption that [it] is in the best interest of the child to be with the natural parent. That is a very, very large gap between what the original bill called for and what . . . the bill as amended would call for. We're still dealing with those magic words, the best interest of the child. . . . We are not talking about . . . an irrebuttable presumption. We are talking about a rebuttable presumption. . . . It does

the express purpose of eliminating all references to the standard of harm and the burden of proof required to rebut the presumption in favor of parental custody. See

not give as much to the natural parent by any stretch of the imagination that the original bill would have. . . . I think that this is a reasonable compromise." 28 S. Proc., Pt. 7, 1985 Sess., pp. 2241–42. Shortly thereafter, the Senate adopted the bill, as amended. Id., p. 2243.

When the bill returned to the House for approval, Representative William L. Wollenberg noted that it had been weakened by the Senate amendment. 28 H.R. Proc., Pt. 16, 1985 Sess., p. 5798. Representative Wollenberg stated, however, that he was satisfied with the outcome because, although the amended bill did not "go nearly as far" as the earlier version, it gave the parent "a leg up," so to speak, in a custody dispute with a third party. Id., p. 5800. Several representatives also remarked that the amended bill, in effect, counteracted the majority holding in *McGaffin* v. *Roberts*, 193 Conn. 393, 479 A.2d 176 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1747, 84 L. Ed. 2d 813 (1985), and incorporated the ideas expressed in Justice Leo Parskey's dissent in that case. 28 H.R. Proc., supra, pp. 5801–5802, 5806, 5808, remarks of Representatives Robert F. Frankel, Richard D. Tulisano and Wollenberg; see *McGaffin* v. *Roberts*, supra, 405–407; id., 410–14 (*Parskey, J.,* dissenting). In *McGaffin*, this court held that General Statutes (Rev. to 1983) § 45-43, now General Statutes § 45a-606, did not create a presumption that a surviving biological parent was entitled to preference in a custody dispute. *McGaffin* v. *Roberts*, supra, 405–407. Although the court acknowledged the "natural importance of parenthood"; id., 406; it had explained that "the constitutional concerns are not entirely parental because the preservation of family integrity encompasses the reciprocal rights of both parent[s] and children." (Internal quotation marks omitted.) Id., 407. Representative Wollenberg declared, in assuring doubters that the best interests of the child would not be ignored, that the presumption in favor of parental custody merely would give "a little more weight" to the parent in a third party custody dispute. 28 H.R. Proc., supra, p. 5804. The House ultimately adopted the bill as amended by the Senate; id., p. 5811; and the bill was passed and signed into law. See Public Acts 1985, No. 85-244, § 2.

The following year, the legislature amended the statute to clarify that the presumption favoring parental custody in a dispute between a parent and a third party could be rebutted by showing that an award of custody to the parent would be detrimental to the child. Public Acts 1986, No. 86-224. The new language reflected the understanding of House and Senate members, articulated when debating the merits of the bill one year earlier, that the statute was consistent with the principles set forth in Justice Parskey's dissent in *McGaffin*. Office of Legislative Research, Bill Analysis for Public Acts 1986, No. 86-224; see *McGaffin* v. *Roberts*, supra, 193 Conn. 410–14 (*Parskey, J.,* dissenting). The legislature added no new language pertaining to the burden of proof.

28 S. Proc., Pt. 7, 1985 Sess., p. 2231, remarks of Senator Richard B. Johnston. In summarizing the amended bill, Senator Anthony V. Avallone stated that there was "a very, very large gap between what the original bill called for and what . . . the bill as amended would call for. We're still dealing with those magic words, the best interest of the child. . . . We are not talking about . . . an irrebuttable presumption [in favor of the parent]. We are talking about a rebuttable presumption. . . . *It does not give as much to the natural parent by any stretch of the imagination that the original bill would have.* . . . I think that this is a reasonable compromise." (Emphasis added.) Id., pp. 2241–42. When the bill was sent back to the House for final approval, Representative William L. Wollenberg stated that the best interests of the child would not be ignored and that the presumption in favor of parental custody would give "a little more weight" to the parent vis-á-vis the nonparent in a third party custody dispute. 28 H.R. Proc., Pt. 16, 1985 Sess., p. 5804. Representative Wollenberg also observed that, although the amended bill did not "go nearly as far" as the earlier version, it gave the parent "a leg up," so to speak, in a custody dispute with a third party. Id., p. 5800. The following year, the statute, which had been enacted without reference to any standard of harm, was amended with little debate to include the current language regarding detriment to the child. Public Acts 1986, No. 86-224. The legislative history therefore suggests that the legislature conceived the standard of harm to be applied in third party custody proceedings as broader and less restrictive than the standard employed in temporary custody and neglect proceedings because the latter standard had been eliminated from the original bill and various members of the legislature had expressed serious concerns regarding the welfare of the child during legislative debate on the matter.

In summary, we conclude that third party custody petitions challenge the liberty interest of a parent in

a way that is fundamentally different from visitation petitions and that the judicial gloss we placed on the visitation statute in *Roth* should not be applied to § 46b-56b because it does not give adequate consideration to the welfare of the child, whose relationship with the parent is at issue in a custody proceeding because of its allegedly harmful effects. This is not the case in a visitation proceeding, in which the child's relationship with the parent has not been placed in issue. The constitutional question in a third party custody proceeding therefore must be framed and resolved in a manner that respects parental rights but that also takes the child's welfare more directly into account. Furthermore, the legislature, for all practical purposes, rejected the temporary custody and neglect standard that we adopted in *Roth* when it deleted language in the third party custody bill that limited the definition of harm to the harm required for removal of a natural parent as guardian. Accordingly, we conclude that the statutory presumption in favor of parental custody may be rebutted only in exceptional circumstances and only upon a showing that it would be clearly damaging, injurious or harmful for the child to remain in the parent's custody. See *In re B. G.*, supra, 11 Cal. 3d 698. We add that this does not mean temporary harm of the kind resulting from the stress of the dissolution proceeding itself but significant harm arising from a pattern of dysfunctional behavior that has developed between the parent and the child over a period of time. Such a standard is not constitutionally infirm or susceptible to the criticism sometimes leveled against the "best interests of the child" test because it does not allow the court to apply its own "personal and essentially unreviewable lifestyle preferences . . . ." (Internal quotation marks omitted.) *Roth* v. *Weston*, supra, 259 Conn. 223. At the same time, the standard we adopt is narrowly tailored to limit the scope of intervention to those exceptional cases in

which parental custody would result in significant harm to the child, thus serving the compelling state interest of protecting the liberty interests of the parents while remaining sensitive to the child's welfare.

B

The concurrence makes numerous arguments, beyond those made by the defendant, as to why the foregoing standard is insufficient to protect the constitutional rights of parents whose ability to care for their children is directly challenged in third party custody proceedings. These arguments may be grouped into two general categories. Arguments falling within the first category assert that, because custody intrudes to a far greater extent than visitation on the constitutionally protected right of parents to raise and care for their children, as well as on the reciprocal right of parents and children to family autonomy or family integrity, third party custody determinations should not be made pursuant to a standard less demanding than the standard we articulated in *Roth*. A corollary of this argument is that the child's right to protection does not rise to the level of a constitutional right equivalent to that of the parent unless the child's safety is endangered. Arguments falling within the second category assert that the standard we have adopted is too open-ended and ambiguous, thus providing trial courts with inadequate guidance and raising concerns relating to constitutional vagueness and the standard's arbitrary application. We disagree with these arguments.

1

The concurrence declares that the standard of harm we articulated in *Roth*—that the child be deemed neglected, uncared-for or dependent—should apply in third party custody proceedings because visitation is merely a limited form of custody, and, therefore, both intrude on the liberty interest of the parent in essentially the same manner. See *Roth* v. *Weston*, supra, 259 Conn.

229 n.13 ("[v]isitation is a limited form of custody during the time the visitation rights are being exercised" [internal quotation marks omitted]). The concurrence also contends, however, that the more intrusive custody award has two additional consequences that further justify application of the visitation standard in *Roth*. The first is that, because third party custody removes a child from the parent for a longer period of time, it deprives the parent of the "quintessential rights of parenthood . . . ." These include the right to make medical, educational, religious and other decisions that affect the most fundamental aspects of the child's life during the custodial period. The second is that custody, unlike visitation, infringes on the broader but related right of family autonomy or family integrity, which encompasses the reciprocal right of parents and children in not being deprived of the intimacy of daily association.[24]

---

[24] The concurrence declares that the majority "misconstrues" the relationship it has drawn between visitation and custody. It states that this court "implicitly recognized in *Roth* that the stringent standard of harm that we adopted in that case clearly would be justified" in third party custody proceedings, and that "the lesser intrusion resulting from visitation was sufficiently similar in kind, albeit not degree, to justify the heightened standard." Footnote 4 of the concurring opinion. This court did *not* conclude in *Roth*, however, either implicitly or otherwise, that the visitation standard would be justified in third party custody proceedings. It simply observed that visitation is similar to custody because the person to whom visitation is awarded may be required to make decisions regarding the child's care during the visitation period. No broader conclusions regarding third party custody may be drawn from the comparison because the issue of third party custody never was raised or addressed in *Roth*.

The concurrence also fails to acknowledge that *Roth* relied on a California visitation case, *In re Marriage of Gayden*, 229 Cal. App. 3d 1510, 1517, 280 Cal. Rptr. 862 (1991), when it noted that visitation "is a limited form of custody during the time the visitation rights are being exercised . . . ." (Internal quotation marks omitted.) *Roth* v. *Weston*, supra, 259 Conn. 229 n.13. The California Court of Appeal had compared visitation to custody and determined that an award of custody to a nonparent required a finding that parental custody "would be detrimental to the child"; *In re Marriage of Gayden*, supra, 1516; the same standard that we adopt for third party custody awards *and* that the California court ultimately adopted for visita-

These observations, considered in isolation, are appealing. Considered in the context of real cases and controversies, however, they fail to recognize or address the ambiguity inherent in troubled family relationships and the variation that inevitably occurs when courts attempt to tailor orders of custody to the unique facts of each case. For example, although it is true that third party custody represents a greater infringement on parental rights than visitation, not all custody awards result in the complete elimination of parental control over the child's life for a significant period of time. Custody awards vary in the length of time that custody is vested in the third party, the amount of contact, if any, that the parent is allowed to retain and the nature and extent of the custodial rights granted. In the present case, the court ordered that joint custody reside with child's mother as well as with the child's paternal aunt, who also was assigned physical custody and ordered to consult with each parent before making major decisions affecting the child's welfare. Both parents therefore continued to participate in the child's life, albeit to varying degrees.[25]

tion awards. Id., 1516–17. Consequently, the concurrence cannot cite *Roth*, and by implication, *In re Marriage of Gayden*, for the proposition that third party custody proceedings require application of the visitation standard.

Finally, to the extent that the concurrence declares that we misconstrue its discussion regarding the effect of visitation and custody on the "quintessential rights of parenthood," it again is mistaken. We make no representation that the concurrence believes that visitation confers such rights. We simply observe that, according to the concurrence, third party custody, *unlike visitation*, has the *additional* effect of depriving the parent of the "quintessential rights of parenthood" because it removes the child from the parent for a longer period of time and thus may preclude the parent from making fundamental decisions concerning the child's life.

[25] We do not "dismiss" the constitutional infringement on parental rights that results from an award of custody, as the concurrence suggests. Nor do we rely on the "hypothetical possibility" of an award of joint custody to justify its conclusions. Indeed, not only are these gross exaggerations, but they miss the point entirely. First, we recognize at the outset of our discussion that the liberty interest of a parent in the care, custody and control of his or her child is one of the oldest of the fundamental liberty interests deserving of heightened protection. See *Troxel* v. *Granville*, supra, 530 U.S. 65. Our

subsequent conclusion is not intended to diminish or ignore this interest but is based on our view that the standard we articulated in *Roth* gives insufficient weight to the troubled parent-child relationship, which is directly challenged in a third party custody proceeding. We similarly conclude that the right of the parent and child to family autonomy or family integrity, although extremely significant, also must be viewed with caution in the context of a third party custody proceeding because of our view that it is not desirable to preserve family autonomy if parental custody will result in significant harm to the child.

Second, we do not discuss joint custody to justify the standard of harm but to demonstrate the wide *variation* in custody orders and that a third party custody award does not necessarily preclude a parent from continued participation in the child's life. See General Statutes § 46b-57 (court may award *partial* custody to any third party "upon such conditions and limitations as it deems equitable"). In the present case, for example, the court ordered that "[t]here shall be reasonable telephone and e-mail contact between the child and her parents" and that the paternal aunt would be required to consult with both parents prior to making decisions affecting the child's welfare. While these orders fall short of allowing the defendant to exercise *final* decision-making authority, the court in another case might have ordered such decisions to be made jointly by the third party and the parent.

In addition, the concurrence's suggestion that our failure to adopt the standard of harm in *Roth* will encourage nonparents to circumvent the more stringent visitation standards by simply seeking limited joint custody instead of visitation is sheer speculation and suggests, at best, a misunderstanding of the differences between the two standards. Third party visitation petitioners must prove that the child will be harmed *by lack of contact with the petitioner*, whereas third party custody petitioners must prove that the child will be harmed *by an award of custody to the parent*. Thus, because third party visitation and custody focus on the child's relationship with different persons, a nonparent wishing to obtain visitation rights because of his or her close relationship with the child presumably would have no factual evidence available to prove that the child's relationship with the parent is detrimental, which is necessary to gain custody. In other words, it would appear to be more, rather than less, difficult for a petitioner seeking visitation to obtain contact with the child by seeking custody instead, assuming that the petitioner would even wish to take on the added responsibility that custody requires.

The concurrence further argues that the availability of the less intrusive "disposition option" of joint custody should have "no weight in determining the procedural and substantive protections necessary to protect the constitutional interests at stake"; footnote 5 of the concurring opinion; again implying that we consider the availability of joint custody as a justification for adopting the broader standard. As we previously noted, however, we do *not* view less intrusive disposition options as justification for a broader standard of harm. It is the *concurrence* that makes the point, in a subsequent part of

More significantly, the concurrence fails to recognize the *qualitative* difference between visitation and custody that we discussed previously in this opinion, namely, that the parent-child relationship itself is at issue in a custody dispute, whereas it is not in a visitation dispute, in which the third party merely seeks the right to visit the child and the parents are presumed to be loving and caring. For this reason, the concurrence's observation that family autonomy or family integrity is undermined *as a result of* a third party custody award is unconvincing. Infringement of the right to family autonomy may be a key consideration in other family controversies, but the intimacy of daily association that the concurrence seeks to protect by applying the more restrictive standard in *Roth* is also, ironically, the alleged *source of harm* that the court must examine to determine whether a third party custody award is justified. Thus, although family autonomy must be protected to the greatest possible extent, it simply is not logical to rely to any great degree on the right of family autonomy or family integrity as a reason for rejecting a third party custody award in favor of parental custody when the value of family autonomy is precisely what is placed in issue when a third party seeks custody.

The concurrence makes the related argument that the *Roth* standard of harm is necessary because, although a state may impose limitations on the constitutional right of a parent to raise his or her child, this right should

its analysis, that it is the *range of available disposition options* that correlate directly to the risk to the child and the parent's ability to meet the child's needs that justifies application of the fair preponderance standard rather than the clear and convincing standard in *neglect* proceedings. The concurrence provides no explanation for this apparent inconsistency in its reasoning.

We finally note that, if we were to adopt the reasoning of the concurrence, the court could award one parent custody over another under the best interests of the child standard but would be required to apply the very restrictive standard articulated in *Roth* if it wished to award a parent and a nonparent joint custody over the objection of the other parent.

not be abridged unless it has been demonstrated that the parent's constitutional interests are no longer paramount, as when the parent is deemed unfit or the child's safety will be jeopardized if the parent retains custody. To support this argument, the concurrence cites a number of statutes and cases from other jurisdictions that purportedly have adopted a more demanding standard that provides the proper degree of constitutional protection for the parental rights at stake.

This argument suffers from two defects. On the one hand, many of the statutes and cases cited by the concurrence describe standards of harm that are no more stringent than the standard articulated in the present case. See, e.g., La. Civ. Code Ann. art. 133 (1999) (parental custody would result in "substantial harm to the child"); Tex. Fam. Code Ann. § 102.004 (a) (1) (Vernon Sup. 2007) (parental custody "would significantly impair the child's physical health or emotional development"); *Evans* v. *McTaggart*, supra, 88 P.3d 1085 (parental custody would be "clearly detrimental" to welfare of child [internal quotation marks omitted]); *Murphy* v. *Markham-Crawford*, supra, 665 So. 2d 1094 (parental custody clearly would be "detrimental" to welfare of child); *Clark* v. *Wade*, supra, 273 Ga. 598 (parental custody would subject child to "physical harm or significant, long-term emotional harm"); *Stockwell* v. *Stockwell*, supra, 116 Idaho 300 (custody for appreciable period of time and best interests of child dictate that custody be with nonparent); *Watkins* v. *Nelson*, supra, 163 N.J. 246, 253 (third party award warranted when "extraordinary circumstances" affect welfare of child and denial of petition would cause serious psychological or other harm to child [internal quotation marks omitted]); *Bailes* v. *Sours*, supra, 231 Va. 100 (there exist "special facts and circumstances . . . constituting an extraordinary reason for taking child from [his or her] parent," such as effect on psychological health

and emotional stability [internal quotation marks omitted]); *In re Custody of Shields*, supra, 157 Wash. 2d 144 (extraordinary circumstances demonstrating "actual detriment to child's growth and development").[26]

Furthermore, the standard of harm that we adopt is consistent with the constitutional protections discussed in *Troxel*. In that case, which required review of a trial court's order granting a third party visitation, the United States Supreme Court determined in a plurality opinion that the state statute involved was unconstitutional because of its "sweeping breadth . . . ." *Troxel* v. *Granville*, supra, 530 U.S. 73. The plurality did not consider the constitutional question of whether the due process clause required all third party visitation statutes to require a showing of actual or potential harm to a child as a condition precedent to granting visitation, declaring in dictum: "We do not, and need not, define . . . the precise scope of the parental due process right in the visitation context. In this respect, we agree with Justice [Anthony Kennedy's dissent] that *the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied* and that the constitutional protections in this area are best 'elaborated with care.' . . . Because much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the

[26] The concurrence asserts that most of these jurisdictions have not held that "extraordinary circumstances" means harm of a "lesser degree" than the harm articulated in *Roth*. Footnote 7 of the concurring opinion. We do not necessarily agree. The jurisdictions in question refer to harm arising from "extraordinary circumstances" most likely because they wish the standard to include harm that may not be expressly described within existing statutory and legal definitions. Similarly, our purpose in allowing trial courts to consider harm arising from "extraordinary circumstances" is to broaden the standard, thus granting courts additional flexibility in awarding custody to a third party when a child suffers from harm that may not be specifically identified in the temporary custody and neglect statutes.

[d]ue [p]rocess [c]lause as a per se matter." (Citation omitted; emphasis added.) Id. In Justice Kennedy's dissenting opinion, to which the plurality referred, he explained that constitutional protections must be elaborated with care because "[w]e must keep in mind that family courts in the [fifty] [s]tates confront these factual variations each day, and are best situated to consider the unpredictable, yet inevitable, issues that arise."[27] Id., 101.

The foregoing observations apply with equal force to third party custody awards and help explain why we articulate a standard of harm that is sufficiently flexible to allow family courts to grant third party custody awards when a child's actual safety may not be endangered but when the child nevertheless may be suffering from other types of significant harm deserving of the relief that an award of third party custody provides. In light of the fact that the third party custody statute at issue in the present case is not overly broad, unlike the Washington visitation statute in *Troxel*, we agree with the plurality in *Troxel* that any remaining constitutional question regarding the standard of harm most likely would arise in connection with the specific manner in which the standard is applied.

2

The concurrence further claims that the standard of harm we adopt is too broad to provide a sufficient

---

[27] We disagree with the concurrence that the only reason the United States Supreme Court did not consider the standard of harm in *Troxel* was "its well established policy of affording substantial deference to state courts in determining the contours of family law, an area of law traditionally relegated to the states." Footnote 10 of the concurring opinion. In our view, the court was not simply recognizing that such issues are best decided by state courts but was making the additional point that *family* courts within the states, which confront these issues on a daily basis, are in a better position to resolve them pursuant to a more flexible, rather than a more strictly defined, standard of harm. See *Troxel* v. *Granville*, supra, 530 U.S. 73.

constitutional safeguard, opening the door to claims of constitutional vagueness and the standard's arbitrary application. We disagree. We have not proposed a standard that would include "any degree of harm," as the concurrence suggests, thus transforming the standard into a best interests test. As we previously stated, the standard is qualitatively different from a best interests test because it does *not* allow the court to rely on its own subjective lifestyle preferences but requires the court to focus on the level of harm that the child would suffer should the parent retain custody. The concurrence also fails to appreciate that we have excluded insubstantial or short-lived harm and contemplate only the type of significant harm that would justify an award of custody in exceptional circumstances. We reiterate that the reason we must allow courts some degree of flexibility in interpreting this standard is that it is impossible to anticipate the infinite types of significant harm to which a child may be exposed if he or she remains with the parent, not all of which may satisfy the standard articulated in the temporary custody and neglect statutes.[28] Accordingly, we do not agree that the standard

---

[28] The concurrence rejects this standard for reasons that are difficult to grasp. On the one hand, it is critical of our attempt to elaborate on the meaning of detriment so as to provide courts with additional guidance. On the other hand, it charges that we do "little to guide the courts in properly balancing the interests at stake." The concurrence specifically complains that the standard of harm that we adopt could "devolve to a best interests test" or be construed to mean (1) "short-term emotional upheaval" resulting from dissolution of the parents' marriage or some other disruptive event, or (2) "the inculcation of values and beliefs that are contrary to social norms," such as a Bohemian lifestyle, thus allowing the court to consider its own more conventional lifestyle preferences when making an award of custody. We have rejected these interpretations, however, and the concurrence concedes as much when it states that the we "[limit] the temporal nature of the harm, requiring something more than the temporary stress attendant to dissolution . . . ." Finally, the concurrence inexplicably concludes that a broad definition of detriment by an intermediate Florida appeals court that makes no reference to the type of harm described in Connecticut's neglect statutes "is entirely consistent" with the standard in *Roth*. See *In re Marriage of Matzen*, 600 So. 2d 487, 490 (Fla. App. 1992) (" '[d]etriment'

of harm set forth in *Roth* is constitutionally required in the context of third party custody proceedings.[29]

## V

We next consider the proper burden of proof, which must satisfy "the constitutional minimum of fundamental fairness." (Internal quotation marks omitted.) *Santosky* v. *Kramer*, 455 U.S. 745, 756 n.8, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). The defendant claims that the standard required in third party custody cases should be clear and convincing evidence. In *Roth*, we determined that, although the clear and convincing standard is not constitutionally mandated in the visitation context, the "stricter standard of proof is sounder because of the ease with which a petitioning party could otherwise intrude upon parental prerogative. . . . The prospect of competent parents potentially getting caught up in the crossfire of lawsuits by relatives and other interested parties demanding visitation is too real a threat to be tolerated in the absence of protection afforded through a stricter burden of proof. Therefore, pursuant to this court's inherent supervisory powers," we concluded that a third party seeking visitation must prove the requisite relationship and harm by clear and convincing evidence. (Citations omitted.) *Roth* v. *Weston*, supra, 259 Conn. 232. These same considerations are not significant in third party custody cases. Moreover, other factors, including the legislature's express rejection of the clear and convincing standard of proof, weigh against the adoption of that standard in the present context. Finally, the clear and convincing standard is not constitutionally required under the test that the

refers to circumstances that produce or are likely to produce lasting mental, physical or emotional harm").

[29] We note that the standard of harm that we adopt for third party custody awards does not rely solely on *In re Joshua S.*, supra, 260 Conn. 207, but is consistent with that of numerous other jurisdictions that also have adopted a more flexible approach. See part IV A of this opinion.

United States Supreme Court established in *Santosky* v. *Kramer*, supra, 756 n.8. We therefore conclude that the proper standard of proof is a fair preponderance of the evidence.

Section 46b-56b is silent with respect to the burden of proof to be satisfied when a third party seeks the custody of a minor child against the wishes of a fit parent. We therefore recapitulate, in part, the legislative history of the statute. The proposed bill, as originally written, directed that the third party establish, "by clear and convincing evidence . . . grounds which would authorize the removal of the natural parent as guardian under [General Statutes (Rev. to 1985) § 45-44c, now General Statutes § 45a-610]." Substitute House Bill No. 5122, 1985 Sess. An amendment to the bill changed the substantive standard but did not change the clear and convincing burden of proof. See 28 H.R. Proc., Pt. 8, 1985 Sess., p. 2615. When the amended bill reached the Senate, however, various members expressed concern that the burden of proof was too high. See 28 S. Proc., Pt. 5, 1985 Sess., pp. 1751–62. Thereafter, the bill was amended to eliminate the standard. See 28 S. Proc., Pt. 7, 1985 Sess., p. 2231, remarks of Senator Johnston. Senator Avallone expressly noted that the omission of the standard constituted a major revision of the bill and represented a "compromise" designed to ensure that the interests of the child would be protected adequately in light of the presumption of parental custody. Id., pp. 2241–42. When the bill, as amended by the Senate, was returned to the House for approval, Representative Wollenberg described it as greatly "weakened" but expressed his satisfaction with the outcome because the statute would now give the fit parent a decided edge over a third party seeking custody of the child, thus addressing the perceived defect in the logic of the majority opinion in *McGaffin* v. *Roberts*, 193 Conn. 393, 479 A.2d 176 (1984), cert. denied, 470 U.S. 1050, 105 S.

Ct. 1747, 84 L. Ed. 2d 813 (1985). See 28 H.R. Proc., Pt. 16, 1985 Sess., pp. 5798, 5800, 5804.

The legislature's rejection of the clear and convincing standard is not inconsistent with the law of other jurisdictions, as there appears to be no uniform rule regarding the burden of proof necessary to rebut a presumption in favor of parental custody. After examining the law of other states, Maryland's highest court found that some "have, indeed, adopted a clear and convincing evidence standard in parent/third party custody cases (or in cases that the court found equivalent to a custody dispute). See *Murphy* v. *Markham-Crawford*, [supra, 665 So. 2d 1093]; *S.G.* v. *C.S.G.*, 726 So. 2d 806 (Fla. App. 1999); *Clark* v. *Wade*, [supra, 273 Ga. 587]; *In re Guardianship of B.H.*, 770 N.E.2d 283 (Ind. 2002); *Greer* v. *Alexander*, 248 Mich. App. 259, 639 N.W.2d 39 (2001). Other [s]tates have adopted [the clear and convincing] standard in cases that, under the law of those [s]tates, are treated more like [termination of parental rights] proceedings than pure custody disputes (*Guardianship of Stephen G.*, 40 Cal. App. 4th 1418, 1426, 47 Cal. Rptr. 2d 409 [1995]), or upon rationales that are inconsistent with [a standard requiring a finding of detriment]. See *Watkins* v. *Nelson*, [supra, 163 N.J. 235] (requiring the third party seeking custody to show circumstances that would justify terminating the parent's parental rights and treating custody in the third party as effectively terminating those rights). A few [s]tates have expressly adopted a preponderance standard for parent/third party custody cases. See *Larkin* v. *Pridgett*, 241 Ark. 193, 407 S.W.2d 374 (1966); *Greening* v. *Newman*, 6 Ark. App. 261, 640 S.W.2d 463 (1982); *In re Perales*, 52 Ohio St. 89, 369 N.E.2d 1047 (1977). Some have articulated other tests—'satisfactory evidence' (*In re Dependency of Terry Klugman*, 257 Minn. 113, 97 N.W.2d 425 [1959]) or 'evidence evincing' (*In re Custody of N.A.K.*, 649 N.W.2d 166 [Minn. 2002]);

'showing clearly' (*Kees* v. *Fallen,* 207 So. 2d 92 [Miss. 1968]); 'clear and conclusive' (*McDonald* v. *Wrigley,* 870 P.2d 777 [Okla. 1994]); 'cogent and convincing' (*Bailes* v. *Sours,* [supra, 231 Va. 96]). Most [s]tates, it appears, have not defined any particular standard of proof but have sought to protect parental rights through the heavy substantive burden placed on the third party—to show unfitness, or 'compelling' or 'cogent' reasons (*In re Custody of Townsend,* [86 Ill. 2d 502, 427 N.E.2d 1231 (1981)], or 'convincing reasons' (see *Ellerbe* v. *Hooks,* 490 Pa. 363, 416 A.2d 512 [1980]; *Albright* v. *Commonwealth ex rel. Fetters,* 491 Pa. 320, 421 A.2d 157 [1980]) or, as in *Watkins* v. *Nelson,* supra, [235] circumstances that would justify termination of parental rights." *Shurupoff* v. *Vockroth,* 372 Md. 639, 655–66, 814 A.2d 543 (2003).

It is well established that, "[w]here no standard of proof is provided in a statute, due process requires that the court apply a standard which is appropriate to the issues involved." *In re Juvenile Appeal (83-CD),* supra, 189 Conn. 296. "The function of a standard of proof, as that concept is embodied in the [d]ue [p]rocess [c]lause and in the realm of factfinding, is to instruct the fact-finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication. . . . [I]n any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants.

"Thus, while private parties may be interested intensely in a civil dispute over money damages, application of a fair preponderance of the evidence standard indicates both society's minimal concern with the outcome, and a conclusion that the litigants should share the risk of error in roughly equal fashion.' . . . When

the [s]tate brings a criminal action to deny a defendant liberty or life, however, the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment. . . . The stringency of the beyond a reasonable doubt standard bespeaks the weight and gravity of the private interest affected . . . society's interest in avoiding erroneous convictions, and a judgment that those interests together require that society impos[e] almost the entire risk of error upon itself. . . .

"[The United States Supreme] Court has mandated an intermediate standard of proof—clear and convincing evidence—when the individual interests at stake in a *state proceeding* are both particularly important and more substantial than mere loss of money. . . . Notwithstanding the state's civil labels and good intentions . . . this level of certainty [is] necessary to preserve fundamental fairness in a variety of *government-initiated proceedings* that threaten the individual involved with a significant deprivation of liberty or stigma." (Citations omitted; emphasis added; internal quotation marks omitted.) *Santosky* v. *Kramer*, supra, 455 U.S. 754–56.

In *Santosky*, the United States Supreme Court held that, "in a hearing on a petition to terminate parental rights, due process require[s] that the state prove statutory termination criteria by a 'clear and convincing evidence' standard rather than by a 'fair preponderance of the evidence' standard. . . .

"The three factors considered in *Santosky* to determine whether a particular standard of proof in a particular proceeding satisfies due process are: (1) the private interests affected by the proceeding; (2) the risk of error created by the chosen procedure; and (3) the

countervailing governmental interest supporting use of the challenged procedure." *Cookson* v. *Cookson*, 201 Conn. 229, 234–35, 514 A.2d 323 (1986).

We conclude that the fair preponderance standard is permissible in the present context not only because it is consistent with the legislature's express rejection of the clear and convincing standard, but, more significantly, because it comports with due process and the requirement of "fundamental fairness" described in *Santosky* v. *Kramer*, supra, 455 U.S. 756.

A

Turning first to the private interests affected, we distinguish two important differences between the termination of parental rights and third party custody proceedings. In a termination proceeding,[30] the sole issue is the fitness of the parent, whereas three interests are at stake in a third party custody proceeding: the parents' liberty interest in the care and custody of the child; the child's shared interest with the parent in family autonomy or family integrity; and the state's and the child's countervailing interests in the child's welfare. Cf. *Lehrer* v. *Davis*, 214 Conn. 232, 236–38, 571 A.2d 691 (1990); *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 297–300. Section 46b-56b specifically directs the

---

[30] The court in *Santosky* determined that the parent's interest in the accuracy and justice of a decision terminating his or her parental rights is "a commanding one" and that such a decision, because it is "final" and "irrevocable," results in "a unique kind of deprivation." (Emphasis in original; internal quotation marks omitted.) *Santosky* v. *Kramer*, supra, 455 U.S. 759. Accordingly, consideration of "the private interest affected . . . weighs heavily against use of the preponderance standard at a state-initiated permanent neglect proceeding." Id. The court noted that the fact-finding or fault stage of a termination proceeding is "not intended . . . to balance the child's interest in a normal family home against the parents' interest in raising the child" but, rather, focuses on the fitness of the parent, and thus "pits the [s]tate directly against the parents." Id. Moreover, during the fact-finding stage of the proceedings, "the [s]tate cannot presume that a child and his parents are adversaries." Id., 760.

court to consider whether the rebuttable presumption in favor of parental custody is overcome by facts showing that such custody would be detrimental to the child. The primary focus of the proceeding is therefore on detriment to the child rather than parental fitness. Second, an award of custody to a third party is subject to modification upon a showing of changed circumstances; see General Statutes § 46b-56 (a) (court may modify any proper order regarding custody); and may allow for continued visitation and communication between the noncustodial parent and the child, as in the present case. An award of third party custody thus represents a lesser intrusion into familial relationships than does the termination of parental rights because it does not result in a final and irrevocable severance of parental rights or "a unique kind of deprivation" that forces parents to confront the state in a termination proceeding. (Internal quotation marks omitted.) *Santosky* v. *Kramer*, supra, 455 U.S. 759. Parental rights are further protected by the standing requirement, the fact that third parties cannot initiate custody proceedings, unlike third parties who are permitted to initiate proceedings in visitation cases; compare General Statutes § 46b-57 with General Statutes § 46b-59; and the substantive standard of harm that requires a third party seeking custody to allege and prove detriment to the child should the parent retain custody. This significant burden should discourage third parties without close relationships to the child from engaging in frivolous attempts to obtain custody and thus preclude repeated and unnecessary litigation. Accordingly, consideration of the private interests affected does not suggest the need for a standard more demanding than a fair preponderance of the evidence.

The concurrence disagrees with the preceding analysis for the following reasons. First, the significant constitutional interest at stake, that is, the right to family

autonomy, is insufficiently protected by the lower standard. Second, even a temporary deprivation of the parent's fundamental right to care for his or her child is an irreparable loss that may require a heightened burden of proof to assure the correctness of the judgment. Third, this court has stated that the child's interests coincide with those of the parent unless the child is subject to the threat of serious physical harm or danger. Fourth, the equipoise in a neglect proceeding does not apply because a court adjudicating neglect has available a range of disposition options that correlate directly to the risk to the child and the parent's ability to meet the child's needs, including allowing the child to remain in the parent's custody. Fifth, in a case in which there is proof by a preponderance of the evidence, but not by clear and convincing evidence, that denial of third party custody would result in real and substantial harm to the child, the court still would have authority to protect the child by bringing the department of children and families (department) into the action, ordering supervised custody or committing the child to the department.[31] We address each of these arguments in turn.

With respect to the first two points, we note that the preservation of family autonomy or family integrity, having been placed in issue by the parents of the child in the custody proceeding itself, provides little justification for adopting a heightened burden of proof in this context. See part IV B 1 of this opinion. Moreover, this court determined more than two decades ago that the fair preponderance standard is constitutionally permissible in temporary custody and neglect proceedings because the child's welfare and safety represents a

---

[31] The concurrence discusses the third, fourth and fifth points in its analysis of the third *Santosky* factor. We discuss them in this context, however, because the focus of the first *Santosky* factor is on the private interests involved, which, in third party custody proceedings, include those of the child.

strong countervailing interest in relative equipoise with the liberty interest of the parent. See *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 287 (when child's interest no longer coincides with that of parent, magnitude of parent's right to family integrity is diminished); see also *In re Juvenile Appeal (84-AB)*, 192 Conn. 254, 263–64, 471 A.2d 1380 (1984). Accordingly, although we agree with the concurrence that the interest of the parent is extremely significant and may require additional protection by imposing a heightened standard of proof in other circumstances, there is well established precedent for applying the fair preponderance standard in third party custody proceedings.

Insofar as the concurrence concludes that the child's interests coincide with those of the parent unless the child is threatened with immediate harm, we disagree. As we previously stated, this court has determined that the interests of a child who is adjudicated neglected, uncared for or dependent, but who is not necessarily threatened with immediate harm, differ from those of the parent. See *In re Juvenile Appeal (84-AB)*, supra, 192 Conn. 263–64. Accordingly, the child's interests in temporary custody and neglect proceedings are in relative equipoise with the shared interest of the parent and child in family autonomy.

The concurrence's view that the relative equipoise in a neglect proceeding exists *only* because the court has available to it a range of disposition options that correlate directly to the risk to the child and the parent's ability to meet the child's needs, including the option of allowing the child to remain with the parent, is incorrect. The concept of equipoise first was considered in *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 276, in which this court stated that the controlling considerations in a constitutional analysis of the appropriate standard of proof in temporary custody proceedings are "the nature of the private interest threatened and the

permanency of the threatened loss." (Internal quotation marks omitted.) Id., 297. With respect to the first factor, the court explained that, although the child's safety is the primary concern in a temporary custody hearing, the parent has a competing interest in family integrity. Id., 298. The child also shares the parent's interest in family integrity. Id. The state, as parens patriae, has a corresponding interest in the child's safety. Id. In attempting to balance the state's interest in the child's safety against the combined interests of the parent and child in family integrity, we concluded that "[a]n elevated standard of proof cannot protect the child's interests . . . because some interest of the child is adversely affected whether the state or the parent prevails. The child's interests are best protected not by an elevated standard of proof, but by the 'risk of harm' standards . . . .

*"Where two important interests affected by a proceeding are in relative equipoise,* as they are in [a temporary custody proceeding], *a higher standard of proof would necessarily indicate a preference for protection of one interest over the other.* . . . We see no reason to make such a value determination . . . and find that the various interests in a temporary custody hearing are best served by applying the normal civil standard of proof which is a fair preponderance of the evidence." (Citation omitted; emphasis added.) Id., 298–99.

We also observed that an award of temporary custody is neither final nor irrevocable because it can be reviewed during the hearings on the neglect petition under § 46b-129 (a) and upon the filing of a petition by the parent or the state for revocation of custody under § 46b-129. Id., 299. We therefore determined that deprivation of the parent's right to exercise custody over his or her children is far less serious than in a termination of parental rights proceeding, in which the clear and

convincing standard is constitutionally required because of the finality of the termination order. Id., 299–300.

Shortly thereafter, we addressed the same issue in the context of a neglect proceeding and again concluded that the proper standard of proof is a fair preponderance of the evidence. See *In re Juvenile Appeal (84-AB)*, supra, 192 Conn. 265. Although the petitioner in a neglect proceeding need not prove that the child is subject to an imminent threat of harm, we concluded that an adjudication of neglect that results in the removal of the child from parental custody is temporary and reviewable and that the two important private interests involved, namely, the safety of the child and the combined family integrity interests of the parent and the child, are in relative equipoise. Id., 264–65. Accordingly, a higher standard necessarily would indicate a preference for the protection of one interest over the other, a choice we did not wish to make. See id.

Even if we accept the concurrence's view that the equipoise between the interests of the child and the parent is due to the multiplicity of disposition options available in a neglect proceeding, it would appear that most children adjudicated neglected under the fair preponderance standard are removed from parental custody, at least for a limited period of time. This is reflected in the language of § 46b-129 (j),[32] which pro-

[32] General Statutes § 46b-129 (j) provides: "Upon finding and adjudging that any child or youth is uncared-for, neglected or dependent, the court may commit such child or youth to the Commissioner of Children and Families. Such commitment shall remain in effect until further order of the court, except that such commitment may be revoked or parental rights terminated at any time by the court, or the court may vest such child's or youth's care and personal custody in any private or public agency that is permitted by law to care for neglected, uncared-for or dependent children or youths or with any person or persons found to be suitable and worthy of such responsibility by the court. The court shall order specific steps that the parent must take to facilitate the return of the child or youth to the custody of such parent. The commissioner shall be the guardian of such child or youth for the duration of the commitment, provided the child or

vides the state with a lengthy list of disposition options when removal is deemed warranted but makes only one brief reference to the alternative option of permitting the parent to retain supervised custody of the child. Correspondingly, the concurrence fails to acknowledge that third party custody awards do not necessarily pre-

youth has not reached the age of eighteen years or, in the case of a child or youth in full-time attendance in a secondary school, a technical school, a college or a state-accredited job training program, provided such child or youth has not reached the age of twenty-one years, by consent of such youth, or until another guardian has been legally appointed, and in like manner, upon such vesting of the care of such child or youth, such other public or private agency or individual shall be the guardian of such child or youth until such child or youth has reached the age of eighteen years or, in the case of a child or youth in full-time attendance in a secondary school, a technical school, a college or a state-accredited job training program, until such child or youth has reached the age of twenty-one years or until another guardian has been legally appointed. The commissioner may place any child or youth so committed to the commissioner in a suitable foster home or in the home of a person related by blood to such child or youth or in a licensed child-caring institution or in the care and custody of any accredited, licensed or approved child-caring agency, within or without the state, provided a child shall not be placed outside the state except for good cause and unless the parents or guardian of such child are notified in advance of such placement and given an opportunity to be heard, or in a receiving home maintained and operated by the Commissioner of Children and Families. In placing such child or youth, the commissioner shall, if possible, select a home, agency, institution or person of like religious faith to that of a parent of such child or youth, if such faith is known or may be ascertained by reasonable inquiry, provided such home conforms to the standards of said commissioner and the commissioner shall, when placing siblings, if possible, place such children together. *As an alternative to commitment, the court may place the child or youth in the custody of the parent or guardian with protective supervision by the Commissioner of Children and Families subject to conditions established by the court.* Upon the issuance of an order committing the child or youth to the Commissioner of Children and Families, or not later than sixty days after the issuance of such order, the court shall determine whether the Department of Children and Families made reasonable efforts to keep the child or youth with his or her parents or guardian prior to the issuance of such order and, if such efforts were not made, whether such reasonable efforts were not possible, taking into consideration the child's or youth's best interests, including the child's or youth's health and safety." (Emphasis added.)

Notably, there is no option permitting unsupervised custody following an adjudication of neglect.

vent parents from exercising control over their children's lives. General Statutes § 46b-57 provides that the court may avoid complete separation of the child from the parent by awarding *partial* custody to the third party "upon such conditions and limitations as it deems equitable."

Finally, the concurrence's assertion that the court has authority to take certain steps to protect a child when there is proof by a fair preponderance of the evidence, but not by clear and convincing evidence, that denial of the third party custody petition will be harmful to the child assumes that the court will take the necessary steps to mitigate further harm. There is no guarantee, however, that the court in any given case will bring the child's situation to the attention of the department and ultimately order relief, as the concurrence suggests.[33] Indeed, the more likely outcome is that the child will continue to live with the parent and continue to suffer the harm that otherwise might have been avoided had the fair preponderance standard been applied. Moreover, the reasoning of the concurrence creates a bizarre incongruity in the law in that a third party who is able to prove by a fair preponderance of the evidence, but not by clear and convincing evidence, that a child is neglected, uncared for or dependent in a third party custody proceeding would not be able to obtain custody of the child, whereas the court in a neglect proceeding could grant custody of a child to a third party in similar circumstances pursuant to § 46b-

---

[33] The concurrence states that this conclusion is "unfair" to our trial courts because it reflects a "concern" that the courts will not take remedial action in such cases. To the contrary, we have great confidence in the ability of trial courts to interpret the law properly so as not to infringe unnecessarily on the liberty interests of parents. Insofar as we recognize that trial courts will follow the law and refrain from awarding custody to third parties or take other actions to protect children when the burden of proof has not been satisfied, we merely recognize that the courts are not, and may not be, expected to take actions, sua sponte, that are not required pursuant to their duties as adjudicators of the law.

129 (j) following an adjudication of neglect by a fair preponderance of the evidence. See General Statutes § 46b-129 (j) (court may vest custody of child with "suitable and worthy" person following adjudication of neglect). The concurrence therefore fails to provide any convincing reason why the fair preponderance standard is not constitutionally permissible under the first *Santosky* factor.

### B

A weighing of the second *Santosky* factor also supports the conclusion that the fair preponderance standard of proof is appropriate in third party custody proceedings. Although there may be differences in the ability of a parent and a third party in any given case to participate in the litigation, we are aware of no evidence of a disparity between the abilities and resources of parents and third parties generally that is equivalent in nature to the disparity between the parent and the state in a termination proceeding.[34] As the court indi-

---

[34] The court in *Santosky* held that numerous factors combine to magnify the risk of error in a termination proceeding. *Santosky* v. *Kramer*, supra, 455 U.S. 762–63. These include "imprecise substantive standards that leave determinations unusually open to the subjective values of the judge"; id., 762; the state's superior resources and ability to assemble its case, which dwarfs the parents' ability to mount a defense, and the state's ability to engage in repeated termination efforts, which the parents cannot forestall, upon the gathering of additional evidence, even when they have attained the level of fitness that the state requires. See id., 763–64. The court noted that "the primary witnesses at the hearing [would] be the agency's own professional caseworkers whom the [s]tate [had] empowered both to investigate the family situation and to testify against the parents. Indeed, because the child is already in agency custody, the [s]tate even has the power to shape the historical events that form the basis for termination." Id., 763. The court thus concluded that the fair preponderance standard, which by its very terms demands consideration of the quantity rather than the quality of the evidence, "create[d] a significant prospect of erroneous termination." Id., 764. The court further stated that, because the likely consequences of an erroneous termination of parental rights were far more severe for the parents than for the child, who could remain in a foster home, for example, a standard that allocated the risk of error nearly equally between the two outcomes did not reflect properly their relative severity. Id., 766.

cated in *Santosky*, the state's ability to bring a termination case against the parents "dwarfs the parents' ability to mount a defense"; *Santosky* v. *Kramer*, supra, 455 U.S. 763; which is not true in third party custody proceedings that involve two private parties. Accordingly, there can be no significant prospect of improper third party custody awards merely because third parties are likely to have more resources than the child's parents. Furthermore, the consequences to the parent of an erroneous third party custody award are not as severe as in a termination proceeding in light of the parent's ability to regain custody by seeking to modify the award upon a showing of error or changed circumstances; see General Statutes § 46b-56; and in light of the court's ability to grant the parent continued visitation and communication with the child as a condition of the third party custody award. The child, in turn, is protected from an erroneous award by the fact that the third party may not seek or obtain custody unless he or she has a relationship with the child akin to that of a parent and by the potential for modification of the award if the parent is able to demonstrate error. It is thus unlikely that the child will suffer serious consequences from an erroneous award of custody under the fair preponderance standard.

The concurrence asserts, pursuant to the second *Santosky* factor, that application of the fair preponderance standard will result in a high risk of erroneous deprivation because (1) the standard of harm that the majority adopts leaves the court's decision open to improper influence by the subjective values of the judge, (2) a reduced standard of proof would increase the possibility of an erroneous decision on the basis of a few instances of misconduct, (3) the court has no obligation similar to that in a neglect proceeding to delineate the specific deficiencies that the parent must remedy to regain custody, (4) there is nothing to prevent a third

party from repeatedly relitigating the custody issue, (5) third party custody does not provide the parent with the procedural protections that are available to parents in neglect proceedings, and (6) the petitioner in the parallel proceeding of removing the natural parent as guardian must prove harm akin to that in a neglect proceeding by clear and convincing evidence. None of these reasons withstands close examination.

In considering the risk of erroneous deprivation, the concurrence declares that, even if the standard of harm is high, imposition of the fair preponderance standard of proof improperly will allow the subjective values of the judge to affect the decision or will result in an award of custody without adequate evidence of misconduct. All custodial decisions, however, by their very nature, involve the exercise of judicial discretion because of the infinite variation that exists in the human condition generally and family relationships in particular. The important consideration is whether the court has been provided with sufficient guidance to focus on the proper facts. In the present case, we believe that it has because, to the extent that this court has placed a judicial gloss on the standard of harm set forth in § 46b-56b, courts will have clear notice that third party custody awards may not be based on a few instances of misconduct, that such awards are justified only in exceptional circumstances and that the petitioner must allege and prove, at the very least, that continued parental custody will be clearly damaging, injurious or harmful to the child. This is a heavy burden under either standard of proof. See *McGaffin* v. *Roberts*, supra, 193 Conn. 412 (*Parskey, J.*, dissenting) (burden on nonparent to disprove presumption in favor of parental custody is "a heavy one").

With respect to whether the fair preponderance standard will encourage repeated litigation, the potential for repeated litigation will be severely curtailed, if not

eliminated entirely, by the fact that § 46b-57, unlike the visitation statute, permits third party intervention only in an existing controversy before the court. Furthermore, the requirement that a petitioner must allege and establish proof of a relationship with the child akin to that of a parent in order to be granted standing is an extremely difficult standard to satisfy. Finally, because third party custody, unlike visitation, requires an extraordinary level of personal, emotional and financial commitment to the child over a lengthy period of time, very few individuals are likely to petition the court for third party custody even one time in any given case, much less repeatedly.

As for the procedural protections available in a neglect proceeding, many of the due process protections in chapters 32a and 35a of the Practice Book afforded the parents of a child in a neglect or termination proceeding, including the right to a hearing, are provided in a custody proceeding. See generally Practice Book c. 25. Although there is no exact counterpart in a third party custody proceeding to the specific steps that a parent may be ordered to take in a neglect proceeding, which are intended to notify the parent of deficiencies that must be remedied to regain custody, Practice Book § 25-60 provides the court in a custody proceeding with authority to conduct a custody evaluation and study. The report filed upon completion of the study may be examined by the parties and introduced into evidence if the author is available for cross-examination. Id. In addition, the trial court typically makes findings of fact that describe the child's troubled relationship with the parent and the specific problems that led the court to deprive the parent of custody, as the trial court did in the present case. General Statutes § 46b-57 also directs the court to award third party custody "upon such conditions and limitations as it deems equitable," which might include steps that the

parent must take to regain custody of the child. General Statutes § 46b-56 (i), for example, provides that, "[a]s part of a decision concerning custody . . . the court may order either parent or both of the parents and any child of such parents to participate in counseling and drug or alcohol screening . . . ." The custody evaluation report, the trial court's often exhaustive findings in a custody proceeding and the conditions attached to a third party custody award, although not the same as the specific steps ordered in a neglect proceeding, may nonetheless serve a function similar to that of the specific steps of providing the parent with notice of the deficiencies that must be remedied and actions that must be taken to regain full custody of the child.

In addition, the concurrence's assertion that the court's decision to remove a child from parental custody in a neglect proceeding is subject to periodic judicial review, unlike third party custody decisions, is simply not true for all children who are adjudicated as neglected. General Statutes § 46b-129 (j) provides in relevant part that, upon an adjudication of neglect, the "court may *vest [the] child's or youth's care and personal custody in any private or public agency that is permitted by law to care for neglected, uncared-for or dependent children or youths or with any person or persons found to be suitable and worthy of such responsibility . . . [and] upon such vesting of the care of such child or youth, such other public or private agency or individual shall be the guardian of such child or youth . . . .*" (Emphasis added.) The periodic judicial review described in § 46b-129 applies only if the child is committed to the custody of the department. *"The legislature . . . did not contemplate mandatory, periodic judicial review of cases in which custody,* rather than ordered as a commitment of the child to [the department, *has] been vested by the court in an appropriate third party* in accordance with § 46b-129 . . . ."

(Emphasis added.) *In re Juvenile Appeal (85-BC)*, 195 Conn. 344, 361, 488 A.2d 790 (1985). Moreover, we have declared, in the context of a neglect proceeding, that when custody of the child is vested in a third party, the custody order is "subject to modification by [the] court if such is in the best interests of the [child]. . . . [A]n adjudication of neglect that results in custody by [the department] is neither final nor irrevocable. . . . We perceive no reason, nor did the legislature express one, to insulate such a vesting under § 46b-129 . . . to a third party from subsequent modification or revocation. . . . [T]he natural mother may petition the court any time prior to the child's eighteenth birthday for revocation of the commitment to the [third party]. A judicial hearing would then provide to the natural mother the opportunity of showing that no cause for commitment exists." (Citation omitted; internal quotation marks omitted.) Id., 367. Accordingly, we have determined that the custody of children who are adjudicated as neglected and whose custody and guardianship are vested in an appropriate third party is *not* required to undergo periodic judicial review but may be modified or revoked at a subsequent judicial hearing initiated by the natural parent.[35] This is similar to the procedures

---

[35] We do not ignore the fact that periodic judicial review is directed toward the goal of family reunification but merely observe that when the custody of a child adjudicated as neglected is vested in an appropriate third party under § 46b-129 (j), the custody order is not subject to judicial review. See *In re Juvenile Appeal (85-BC)*, supra, 195 Conn. 361.

The concurrence attempts to diminish this conclusion by stating that *In re Juvenile Appeal (85-BC)* does not address whether the vesting of custody in a third party *directly following* the court's adjudication of neglect, rather than at some later time following transfer from the custody of the commissioner of children and families (commissioner), as in that case, eliminates the need for "reunification efforts and the attendant measures" articulated in § 46b-129. *In re Juvenile Appeal (85-BC)*, however, makes no such hair-splitting distinction. The court merely states that the commissioner does not have the same obligation to conduct judicial review when the trial court vests custody in an appropriate third party as when a child is committed to the commissioner's custody. See *In re Juvenile Appeal (85-BC)*, supra, 195 Conn. 361. The court explained that commitment cases require judicial

that apply in third party custody proceedings, in which the natural parent is free to seek a subsequent order of modification to regain custody of the child. See General Statutes § 46b-56. Thus, insofar as periodic judicial review is concerned, neglect proceedings in which the court ultimately vests custody of the child in a third party do not necessarily provide parents with procedural protections any greater than the protections available to parents in third party custody proceedings.

The concurrence finally asserts that the clear and convincing standard should apply in third party custody proceedings because the custody statute is substantially similar to the removal of parent as guardian (removal of guardianship) statute; see General Statutes § 45a-610; which requires allegations and proof of harm similar to that in a neglect proceeding but employs the clear and convincing standard of proof. The concurrence asserts that a comparison of the two statutes is appropriate because neither provides the parent with significant procedural protections, which is not the case under the neglect statutes. As we noted previously in this opinion, however, third party custody proceedings provide the parent with procedural protections similar to those in a neglect proceeding. In fact, parents in third party custody proceedings will hereinafter receive one extremely significant protection that parents in removal of guardianship, temporary custody and neglect proceedings do not, namely, the requirement that the petitioner demonstrate a relationship with the child akin to that of a parent. In removal of guardianship and neglect cases, the state, the court and a number of other designated parties and entities that have no relationship

review because of legislative concerns regarding lengthy placements of children in foster homes or other institutions during the commitment period, which do not exist when the child is placed in the custody of an appropriate third party under § 46b-129. See id. Finally, the fact that the court did not consider whether the constitution mandates judicial review is no reason to ignore its analysis of judicial review in the present context.

or significant personal bond with the child are permitted to initiate proceedings that may result in the removal of the child from parental custody. See General Statutes § 45a-614 (any adult relative by blood or marriage, court on own motion and counsel for minor may apply for removal of parent as guardian); General Statutes § 46b-129 (a) ("[a]ny selectman, town manager, town, city or borough welfare department, any probation officer, or the Commissioner of Social Services, the Commissioner of Children and Families or any child-caring institution or agency approved by the Commissioner of Children and Families, a child or such child's representative or attorney or foster parent of a child . . . may file with the Superior Court . . . a verified petition plainly stating such facts as bring the child or youth within the jurisdiction of the court as neglected, uncared-for or dependent"). In contrast, it is highly unlikely that there would be more than one person other than a parent in the life of a child who would be able to satisfy the heightened standing requirement of a relationship akin to that of a parent. Application of the fair preponderance standard in a third party custody proceeding thus should not result in any greater risk of erroneous deprivation than the risk inherent in a neglect or removal of guardianship proceeding.

C

With respect to the third *Santosky* factor, although the state has no direct interest in a custody proceeding that involves two private parties, it has a clear interest in protecting both the constitutional rights of the parent and the welfare of the child by ensuring that the proceeding is conducted fairly and at a reasonable cost.[36]

---

[36] The court in *Santosky* declared that the third factor, the state's countervailing interest in parental rights termination proceedings, consists of "a parens patriae interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings," both of which it deemed to be compatible with the clear and convincing standard of proof. *Santosky* v. *Kramer*, supra, 455 U.S. 766. The court specifically concluded that "the parens patriae interest favors

The fair preponderance standard is compatible with this goal because the court is guided by clearly articulated rules regarding standing and detriment to the child that protect parental rights as well as the child's interests. Moreover, Connecticut courts are familiar with the fair preponderance standard in the family law context because the same standard is applied in other custody proceedings, including custody disputes between parents; see, e.g., *Cookson* v. *Cookson,* supra, 201 Conn. 237 (preponderance standard is applicable because "the private interests involved in a custody dispute between parents and the effect on those interests wrought by a judicial transfer of custody are not such that the constitution requires the use of a 'clear and convincing' standard of proof"); temporary custody hearings; see *In re Juvenile Appeal (83-CD),* supra, 189 Conn. 297 (clear and convincing standard not required in temporary custody hearing because, unlike termination of parental rights hearing, "[1] the nature of the private interests concerned in the two kinds of hearings differs, and [2] the deprivation of rights in a temporary custody adjudication is neither final nor irrevocable"); and hearings regarding the appointment of testamentary guardians. See *In re Joshua S.,* supra, 260 Conn. 206

preservation, not severance, of natural familial bonds"; id., 766–67; and that "a stricter standard of proof would reduce factual error without imposing substantial fiscal burdens upon the [s]tate." Id., 767. The court stated that these goals would be served by "procedures that promote an accurate determination of whether the natural parents can and will provide a normal home." Id. In this regard, the court noted that New York family court judges already were familiar with the higher standard of proof in other parental rights termination proceedings not involving permanent neglect. Id.

The court ultimately determined that the fair preponderance standard was "constitutionally intolerable" in a parental rights termination context because "[t]he individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state." (Internal quotation marks omitted.) Id., 768. The court thus held that either the reasonable doubt standard or the clear and convincing standard would satisfy due process in such a proceeding. See id., 769–70.

(preponderance standard required to rebut presumption in favor of testamentary guardian); see also *South Windsor* v. *South Windsor Police Union Local 1480, Council 15, AFSCME, AFL-CIO*, 255 Conn. 800, 825, 770 A.2d 14 (2001) (in civil litigation, normal burden of persuasion is preponderance of evidence). Although we recognize that the clear and convincing standard also is applied in the family law context, including cases involving the termination of parental rights; see General Statutes §§ 17a-111b (b), 17a-112 (i) and (j), and 45a-717 (f) and (g); and the removal of a parent as guardian; see General Statutes § 45a-610; we cannot conclude that the third *Santosky* factor weighs against application of the fair preponderance of the evidence standard in third party custody disputes.

The fair preponderance standard also is consistent with our declaration in *Roth* that "the heightened standard of clear and convincing evidence is not constitutionally mandated" in visitation cases. *Roth* v. *Weston*, supra, 259 Conn. 231. As we stated in *Lehrer*, "even when the contemplated state intrusion is most severe, as in an action for termination of parental rights, the state is required only to provide an appropriately demanding standard of proof so as to guarantee fundamentally fair *procedures*. . . . *Santosky* v. *Kramer*, supra, [455 U.S.] 754. *Lesser intrusions, such as custody orders, represent a difference in kind and not in degree . . . from termination proceedings, and thus permit intervention on a lesser standard of proof.* The constitutional requirement of procedural due process thus invokes a balancing process . . . ." (Citation omitted; emphasis altered; internal quotation marks omitted.) *Lehrer* v. *Davis*, supra, 214 Conn. 238.

The only other jurisdiction that has conducted a detailed and thoughtful analysis of the standard of proof under *Santosky* has concluded that the clear and convincing standard is neither constitutionally required nor

appropriate in third party custody cases. *Shurupoff* v. *Vockroth*, supra, 372 Md. 660. In *Shurupoff*, the Court of Appeals of Maryland initially noted that, aside from the fact that a third party custody award is a temporary, modifiable order, custody orders are varied in nature, and the parent does not always lose complete legal and physical custody of the child. Id., 653. Even when a third party is awarded both legal and physical custody, the parent does not necessarily lose the right to visit and communicate with the child, keep abreast of the child's activities, influence the child's development or leave the child an inheritance, all of which would be lost if parental rights were terminated. Id., 653–54. The court further observed that the issue in a third party custody case may be, and often is, the immediate safety and short-term welfare of the child, and that third party custody awards that preserve the parental relationship are granted in many cases for a limited period of time until the parent can prove changed circumstances to regain custody. Id., 657–58. The court concluded that, if the standard of proof is too high, "it may well be the child who will suffer." Id., 658.

To summarize, in cases in which a third party seeks to intervene in a custody proceeding brought pursuant to § 46b-56 (a), the party must prove by a fair preponderance of the evidence facts demonstrating that he or she has a relationship with the child akin to that of a parent, that parental custody clearly would be detrimental to the child and, upon a finding of detriment, that third party custody would be in the child's best interest. In cases in which the trial court considers awarding custody to a third party who has not intervened pursuant to § 46b-57, the court may award custody to the third party provided that the record contains proof of the foregoing facts by a fair preponderance of the evidence.

## VI

In the present case, the trial court failed to apply the correct standard when it granted Husaluk's motion to intervene and awarded her custody solely on the basis of the best interest of the child. Thereafter, the Appellate Court properly rejected the defendant's claim that the trial court should have awarded custody on the basis of the standard articulated in *Roth* but improperly affirmed the award of custody to Husaluk on the ground that it was in the best interest of the child.[37]

The judgment of the Appellate Court is affirmed insofar as it reverses the trial court's judgment as to the allocation of tax dependency exemptions;[38] the judgment of the Appellate Court is reversed in all other respects and the case is remanded to that court with direction to reverse the trial court's judgment and to remand the case to the trial court for further proceedings according to law.

In this opinion NORCOTT, VERTEFEUILLE and SULLIVAN, Js., concurred.

KATZ, J., with whom BORDEN and PALMER, Js., join, concurring. I agree with the majority's conclusion that the judgment of the Appellate Court affirming the trial court's judgment awarding custody of the minor child of the defendant, Andrew J. Fish, to the child's paternal aunt, Barbara Husaluk, over the defendant's objection must be reversed and the case remanded for further proceedings. Specifically, I agree with part II A of the majority opinion that, in order to satisfy the

---

[37] Although the Appellate Court summarily concluded that "there was ample evidence for the [trial] court to conclude that the presumption in the defendant's favor was rebutted"; *Fish* v. *Fish*, supra, 90 Conn. App. 757; the court conducted no analysis of whether it would be detrimental to the child to remain in the defendant's custody.

[38] See footnote 6 of this opinion.

constitutional concerns highlighted by this court in *Roth* v. *Weston*, 259 Conn. 202, 234–35, 789 A.2d 431 (2002), a third party seeking custody, like a third party seeking visitation, must allege a parent-like relationship with the child to have standing to seek custody over a presumptively fit parent's objection. I also agree that the trial court improperly awarded custody solely on the basis of a determination that third party custody was in the best interests of the child. That is where my agreement with the majority ends.

The majority determines that a third party may obtain custody over the objection of a parent who has not been deemed unfit upon demonstrating by a mere preponderance of the evidence that parental custody would be "detrimental to the child" pursuant to General Statutes § 46b-56b.[1] Although the majority implicitly concludes that § 46b-56b requires a judicial gloss, it ultimately concludes that less stringent proof requirements than those established by this court in *Roth* to safeguard the constitutionally protected rights of the parent and the family unit when a third party petitions for visitation are adequate to protect those same constitutional interests when a third party petitions for custody. In rejecting the *Roth* standard of harm, the majority relies on the following reasoning: (1) the *Roth* standard is not sufficiently "flexible" and "provide[s] insufficient room for the judicial discretion necessary to formulate solutions that take into account the unique facts and circumstances of each particular case"; (2) other jurisdictions have adopted a "detriment" standard but have declined to define that term with more precision to allow such flexibility; (3) this court declined to

---

[1] General Statutes § 46b-56b provides: "In any dispute as to the custody of a minor child involving a parent and a nonparent, there shall be a presumption that it is in the best interest of the child to be in the custody of the parent, which presumption may be rebutted by showing that it would be detrimental to the child to permit the parent to have custody."

adopt a standard of harm as restrictive as the *Roth* standard when we had an opportunity to interpret the detriment standard in a related context; and (4) prior to our decision in *Roth*, the legislature rejected the standard of harm adopted in *Roth*. In rejecting the heightened clear and convincing burden of proof that this court applied in *Roth*, the majority reasons that a lesser burden comports with due process in essence because third party custody does not rise to the level of termination of parental rights.

I disagree with this reasoning. The time-tested *Roth* standard strikes the proper balance between protecting the constitutional rights at stake and safeguarding the child's welfare. Because the intrusion on the constitutionally protected interests of the parent and the family unit is significantly greater when a court acts to deprive a parent of custody of his or her child than when a court awards visitation to a third party over a parent's objection, I cannot agree that a lesser standard suffices. Indeed, because third party custody not only deprives the parent and child of each other's companionship, but also deprives the parent of the right to make decisions affecting every aspect of a child's physical, social and moral development, the infringement on a parent's right to raise his or her own child and on the family unit's autonomy is akin to that arising from the termination of parental rights for as long as custody is vested in that third person to the exclusion of the parent. Accordingly, I would conclude that, in order to divest a parent of custody, a third party must plead and prove, by clear and convincing evidence, that they have a parent-like relationship with the child and that "real and substantial harm"; *Roth* v. *Weston*, supra, 259 Conn. 229; akin to that under our neglect statutes will result should custody not be vested in the third party.

## I

To address the question of whether the *Roth* standard of harm constitutionally is mandated, I begin with this court's reasoning for adopting that standard in that case. In *Roth* v. *Weston*, supra, 259 Conn. 209–10, this court determined that, in light of the United States Supreme Court's decision in *Troxel* v. *Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), we must reconsider the constitutional gloss that we had placed on the third party visitation statute, General Statutes § 46b-59, just six years earlier in *Castagno* v. *Wholean*, 239 Conn. 336, 684 A.2d 1181 (1996).[2] The court concluded that the jurisdictional requirements that we had added in *Castagno* "[did] not adequately acknowledge the status of parents' interest in the care, custody and control of their children as 'perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court.' "[3] *Roth* v. *Weston*, supra, 216.

[2] In *Castagno* v. *Wholean*, supra, 239 Conn. 350, the court engrafted threshold jurisdictional requirements onto § 46b-59 that would permit the trial court to entertain a petition for visitation only when the family life of the minor child had been disrupted either by state intervention analogous to the situations included within the custody statutes, General Statutes §§ 46b-56 and 46b-57 or "in a manner similar to that addressed by §§ 46b-56 and 46b-57, but in which the courts have not yet become involved." The court declined to state precisely what those similar circumstances would be, but cited as possibilities the death of a parent, a de facto separation of the parents or "when there has been a good faith allegation by a third party of abuse or neglect." Id., 352.

[3] The Supreme Court's decisions recognizing this fundamental right date back to at least 1923. See *Meyer* v. *Nebraska*, 262 U.S. 390, 399, 401–403, 43 S. Ct. 625, 67 L. Ed. 1042 (1923) (concluding that "proficiency in foreign language . . . is not injurious to the health, morals or understanding of the ordinary child" and recognizing right of parents to "establish a home and bring up children" and to "control the education of their own"); *Pierce* v. *Society of Sisters*, 268 U.S. 510, 534–35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925) (holding that state could not interfere with parents' decision to send children to private schools when decision was "not inherently harmful" and recognizing right "to direct the upbringing and education of children under their control"); *Wisconsin* v. *Yoder*, 406 U.S. 205, 232, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972) (exempting Amish from state compulsory education law requiring children to attend public school until age eighteen, recognizing that "primary

Therefore, the court considered "what interest would be sufficiently compelling to warrant state intrusion into a parent's decision to limit or deny visitation to a third party." Id., 222. The court reasoned that, "[i]n light of the compelling interest at stake, the best interests of the child are secondary to the parents' rights. . . . Because parenting remains a protected fundamental right, the due process clause leaves little room for states to override a parent's decision even when that parent's decision is arbitrary and neither serves nor is motivated by the best interests of the child." (Citations omitted.) Id., 223. While recognizing the constitutional significance of the interests at stake, the court was mindful that "[t]here are . . . limitations on these parental rights. . . . [I]t is unquestionable that in the face of allegations that parents are unfit, the state may intrude upon a family's integrity." (Citations omitted.) Id., 224;

---

role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition"); see also *Prince* v. *Massachusetts*, 321 U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944) ("[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder"); *Stanley* v. *Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972) ("[i]t is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come[s] to this [c]ourt with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements' "); *Quilloin* v. *Walcott*, 434 U.S. 246, 255, 98 S. Ct. 549, 54 L. Ed. 2d 511 (1978) ("[w]e have recognized on numerous occasions that the relationship between parent and child is constitutionally protected"); *Parham* v. *J. R.*, 442 U.S. 584, 602, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course."); *Santosky* v. *Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (discussing "[t]he fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Washington* v. *Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997) ("[i]n a long line of cases, we have held that, in addition to the specific freedoms protected by the [b]ill of [r]ights, the 'liberty' specially protected by the [d]ue [p]rocess [c]lause includes the righ[t] . . . to direct the education and upbringing of one's children" [citations omitted]).

see *Troxel* v. *Granville*, supra, 68–69 ("so long as a parent adequately cares for his or her children [i.e., is fit], there will normally be no reason for the [s]tate to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children"). Accordingly, the court reasoned that "a requirement of an allegation such as abuse, neglect or abandonment would provide proper safeguards to prevent families from defending against unwarranted intrusions and would be tailored narrowly to protect the interest at stake." *Roth* v. *Weston*, supra, 224. The court considered whether some lesser harm could justify such an intrusion, but concluded that "the only level of emotional harm that could justify court intervention is one that is akin to the level of harm that would allow the state to assume custody under General Statutes §§ 46b-120 and 46b-129—namely, that the child is 'neglected, uncared-for or dependent' as those terms have been defined." Id., 226. The court reasoned that, "although the plurality [opinion] in *Troxel* [had] avoided the issue, [the United States Supreme Court's] prior decisions clearly reflect a tolerance for interference with parental decisions only when the health or safety of the child will be jeopardized or there exists the potential for significant social burdens." Id., 228.

With this background in mind, I turn to the question of whether third party custody petitions implicate any lesser or substantively different intrusion on family autonomy and a parent's right to exercise care, control and custody over a child than the intrusion resulting from a third party visitation petition, such that the custody statutes need not embody the same procedural and substantive protections that we applied, as a judicial gloss, to § 46b-59 in *Roth*. I would conclude that they do not. Indeed, it is evident that third party custody constitutes a significantly greater infringement.

In *Roth*, after articulating the requisite pleading and proof requirements, the court expressly noted: "We recognize that the burden of harm that the statute imposes may be deemed unusually harsh in light of the fact that visitation, as opposed to custody, is at issue. We draw no distinction, however, for purposes of this discussion. Visitation is a limited form of custody during the time the visitation rights are being exercised . . . ."[4] (Internal quotation marks omitted.) *Roth* v. *Weston*, supra, 259 Conn. 229 n.13; accord *In re Marriage of Gayden*, 229 Cal. App. 3d 1510, 1517, 280 Cal. Rptr. 862 (1991) (visitation is "a limited form of custody during the time the visitation rights are being exercised"); *Jackson* v. *Fitzgerald*, 185 A.2d 724, 726 (D.C. 1962) ("[t]he right of visitation derives from the right to [c]ustody"); *Alison D.* v. *Virginia M.*, 77 N.Y.2d 651, 656–57, 572 N.E.2d 27, 569 N.Y.S.2d 586 (1991) ("[t]o allow the courts to award visitation—a limited form of custody—to a third person would necessarily impair the parents' right to

---

[4] The majority dismisses these statements as "overly simplistic" in the context of the issue in the present case and misconstrues the relationship that I have drawn between visitation and custody. With respect to the first point, this court implicitly recognized in *Roth* that the stringent standard of harm that we adopted in that case clearly would be justified if the state was engaging in the greater intrusion on the parent's constitutional rights attendant to a custody order, but that the lesser intrusion resulting from visitation was sufficiently similar in kind, albeit not degree, to justify the heightened standard.

The majority misconstrues the point I have made in citing to this analogy by asserting that the concurrence declares that: visitation is "merely" a limited form of custody; that both therefore "intrude on the liberty interest of the parent in essentially the same manner"; and that "because third party custody removes a child from the parent for a longer period of time, it deprives the parent of the 'quintessential rights of parenthood . . . .' " With the lone exception of accurately quoting the phrase "quintessential rights of parenthood," the majority misconstrues the discussion herein as to the relationship between, and the differences attendant to, visitation and custody. As the discussion herein clearly makes evident, visitation is one limited aspect of the bundle of rights that constitutes custody. Irrespective of how long the period of visitation ordered, visitation never confers the "quintessential rights of parenthood" attendant to custody.

custody and control"); *Clark* v. *Clark*, 294 N.C. 554, 575–76, 243 S.E.2d 129 (1978) ("[v]isitation privileges are but a lesser degree of custody"); *Middleton* v. *Johnson*, 369 S.C. 585, 594, 633 S.E.2d 162 (App. 2006) ("[u]nder the penumbra of custody is the lesser included right to visitation").

Although clearly related, the legal rights and privileges attendant to an order of custody are more intrusive than those attendant to an order of visitation. As one judge explained: "Full custody denotes the care, control, and maintenance of a child including all physical and legal aspects of custody, and the child resides with the person to whom custody was awarded. . . . Visitation normally represents a period of access by a non-custodial individual. It differs from full custody in that the child does not dwell with the non-custodial individual, and, although this individual can be responsible for the care and safety of the child, he or she may not make important decisions for the child. . . . Full custody confers rights and authority upon the one in whom it is placed as opposed to the privilege of visiting." (Citations omitted.) *Hiller* v. *Fausey*, 588 Pa. 342, 378–79, 904 A.2d 875 (2006) (Newman, J., concurring), cert. denied, 549 U.S. 1304, 127 S. Ct. 1876, 167 L. Ed. 2d 363 (2007).

Thus, an award of full custody to a third person deprives the parent of far more than the right to the child's companionship for some limited period during which visitation occurs. It deprives the parent of the quintessential rights of parenthood—to make decisions that affect the child's development, such as determining the child's associations, education and medical treatment, and to inculcate religious beliefs and moral values. See *Wisconsin* v. *Yoder*, 406 U.S. 205, 232–33, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972) ("the primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American

tradition," particularly in matters of "moral standards, religious beliefs, and elements of good citizenship"). As such, a third party custody petition implicates a significantly greater intrusion on a parent's constitutional interest than does a third party visitation petition.

In considering the constitutional question before us, it is important to recognize that the constitutional rights at stake include more than the parent's right to control the child's upbringing. It also includes the broader right of family autonomy or family integrity. "[The] right to family integrity . . . encompasses the reciprocal rights of both parent and children . . . the interest of the parents in the companionship, care, custody and management of [their] children . . . and of the children in not being dislocated from the emotional attachments that derive from the intimacy of daily association with the parent . . . ." (Citations omitted; internal quotation marks omitted.) *Pamela B.* v. *Ment*, 244 Conn. 296, 310, 709 A.2d 1089 (1998); see *In re Christina M.*, 280 Conn. 474, 486–87, 908 A.2d 1073 (2006) ("[i]n cases involving parental rights, the rights of the child coexist and are intertwined with those of the parent" [internal quotation marks omitted]); see also *Santosky* v. *Kramer*, 455 U.S. 745, 760–61, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (prior to termination, it is presumed that interests of child and parent coincide). An award of custody to a third party invariably attenuates and potentially destroys the emotional attachments that the child derives from the intimacy of daily association with his or her parent. Thus, family integrity is undermined as a result of third party custody in a manner that is not implicated in third party visitation. In sum, the constitutional infringement is greater in third party custody; hence, a lesser standard of harm than that which we required in *Roth* for visitation reasonably cannot be justified. Moreover, the hypothetical possibility of an award of joint custody in third party custody petitions, which the majority relies on to dismiss the greater con-

stitutional infringements attendant to an award of custody, does not change the fundamental effect of the intrusion.[5]

Although this court and the United States Supreme Court have recognized that there is an independent

[5] The majority's reliance on the possibility of joint custody is troubling for several reasons. The present case does not illustrate the availability of this disposition. The trial court did not order that joint custody be shared with the parent that opposed Husaluk's petition for custody; the court ordered that Husaluk and the plaintiff, Paula J. Fish, the child's mother, who did not object to Husaluk's petition, share custody. Moreover, the court's orders pertaining to both parents leave them with none of the essential rights of parenthood, only the illusory right of "consultation" before Husaluk makes any decision regarding the child's upbringing. Thus, the present case illustrates the unlikelihood that a court will determine that parental custody is contrary to the child's interests and yet still permit that parent to share custody with a third party.

More troubling, however, is the effect of the majority's suggestion that joint custody is a proper disposition when a third party seeks custody over a fit parent's objection in conjunction with its holding that less stringent standards of pleading and proof apply in custody petitions than those applied in third party visitation petitions. By so concluding, the majority in effect encourages nonparents to circumvent the more stringent visitation standards by simply seeking limited joint custody instead of visitation.

Finally, I note that, even if joint legal custody may be a disposition option in a third party custody dispute, the fact that a less intrusive disposition may be available has no weight in determining the procedural and substantive protections necessary to protect the constitutional interests at stake. Courts gauge requisite constitutional standards on the basis of the greatest possible infringement that could result from an adverse decision in the proceeding, not the least intrusive result. For example, in a proceeding to terminate parental rights, a heightened standard of proof is constitutionally mandated, even though the court may determine in the dispositional phase that termination is not warranted, because the proceeding *could* result in the termination of parental rights. See *In re Deana E.*, 61 Conn. App. 185, 189, 763 A.2d 37 (2000) (citing clear and convincing evidence standard applied in two tier analysis before termination may be ordered and noting "[i]t is thus possible for a court to find that a statutory ground for termination of parental rights exists but that it is not in the best interests of the child to terminate the parental relationship, although removal from the custody of the parent may be justified" [internal quotation marks omitted]), cert. denied, 255 Conn. 941, 768 A.2d 949 (2001); see also *In re Baby Girl B.*, 224 Conn. 263, 279, 618 A.2d 1 (1992) ("[t]ermination of parental rights does not follow automatically from parental conduct justifying the removal of custody").

interest in "safeguarding the physical and psychological well-being of a minor"; (internal quotation marks omitted) *Osborne* v. *Ohio*, 495 U.S. 103, 109, 110 S. Ct. 1691, 109 L. Ed. 2d 98 (1990); accord *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 287, 455 A.2d 1313 (1983); the Supreme Court has rejected the view that this interest rises to the level of a constitutional right, such that it would stand on equal footing with the constitutional right to family autonomy; see *DeShaney* v. *Winnebago County Dept. of Social Services*, 489 U.S. 189, 201, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989) ("[s]tate had no constitutional duty to protect [child from abuse while in parent's custody]"); and this court recently declined to address that issue under our state constitution. See *Teresa T.* v. *Ragaglia*, 272 Conn. 734, 760 n.16, 865 A.2d 428 (2005) (declining, in light of scope of certified questions on appeal, to reach plaintiff's argument "that there is a substantive due process right to child protection under the constitution of Connecticut"). As this court recognized in *Roth*, however, the state's interest in protecting children is of sufficient magnitude that a state may impose "limitations" on these constitutional rights.[6] *Roth* v. *Weston*, supra, 259 Conn. 224. The court

[6] The Supreme Court continually has reaffirmed that "a [s]tate's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.' . . . 'A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens.' . . . Accordingly, [the court has] sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." (Citations omitted.) *New York* v. *Ferber*, 458 U.S. 747, 756–57, 102 S. Ct. 3348, 73 L. Ed. 2d 1113 (1982). With the exception, however, of cases involving neglect or abuse consistent with the standard under §§ 46b-120 and 46b-129, wherein a parent temporarily may lose custody or eventually have his or her parental rights terminated, the cases in which the court has permitted the state to infringe upon the constitutionally protected rights of the parent and family unit upon a lesser degree of harm involve a discrete, limited intrusion on one aspect of parental decision-making, not a wholesale usurpation of the parent's role or the destruction of the family unit. See, e.g., *Prince* v. *Massachusetts*, 321 U.S. 158, 168, 64 S. Ct. 438, 88 L. Ed. 645 (1944) (upholding statute prohibiting child from distributing literature on street

explained therein that the jurisdictional pleading requirement of real and substantial harm akin to the requirements of §§ 46b-120 and 46b-129 both addresses this concern *and* conforms to constitutional jurisprudence by providing that the state may interfere with the family's autonomy only when there is sufficient evidence that the constitutional interests no longer are paramount, such as when the child's health or safety is jeopardized. Id., 228; see also *In re Juvenile Appeal (83-CD)*, supra, 287–88 ("The language of [General Statutes] § 17-38a [e] clearly limits the scope of intervention to cases where the state interest is compelling . . . . Intervention is permitted only where 'serious physical illness or serious physical injury' is found or where 'immediate physical danger' is present. It is at this point that the child's interest no longer coincides with that of the parent, thereby diminishing the magnitude of the parent's right to family integrity . . . and therefore the state's intervention as parens patriae to protect the child becomes so necessary that it can be considered paramount." [Citations omitted.]). As I have noted previously herein, the court reached that conclusion because of the substantial body of case law "clearly reflect[ing] a tolerance for interference with parental decisions only when the health or safety of the child will be jeopardized or there exists the potential for significant social burdens." *Roth* v. *Weston*, supra, 228; see also *Parham* v. *J. R.*, 442 U.S. 584, 604, 99 S. Ct. 2493, 61 L. Ed. 2d 101 (1979) ("[i]n defining the respective rights and prerogatives of the child and parent in the voluntary commitment setting, we conclude that our

notwithstanding statute's effect on freedom of religious expression and parent's right to teach child tenets and practices of religious faith); see also *Stanley* v. *Illinois*, 405 U.S. 645, 651–52, 657–58, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972) (concluding that, whereas father's interest in "companionship, care, custody, and management" of his children is "cognizable and substantial," state's interest in caring for his children is "de minimis" if father is in fact fit parent).

precedents permit the parents to retain a substantial, if not the dominant, role in the decision, absent a finding of neglect or abuse, and that the traditional presumption that the parents act in the best interests of their child should apply"). Indeed, in recognition of these competing concerns, many other states have permitted an award of custody to a third party over a parent only if the parent is unfit or the child's welfare seriously is at stake.[7]

---

[7] See, e.g., La. Civ. Code Ann. art. 133 (West 1999) (custody to parent would result in "substantial harm" to child); Minn. Stat. §§ 257C.01 (3) and 257C.03 (6) and (7) (2006) (child has lived with petitioner two years immediately preceding custody petition without parent's presence and without parental involvement for six months to one year, depending on child's age; parent has abandoned, neglected or disregarded child's well-being to extent that child will be harmed by living with parent, presence of physical and/or emotional danger to child in remaining with parent, or other extraordinary circumstances); Tex. Fam. Code Ann. §§ 102.004 (a) (1) and 153.131 (a) (Vernon 2002) (parental custody "presents a serious question concerning child's physical health or welfare" or "would significantly impair the child's physical health or emotional development"); *H.E.B.* v. *J.A.D.*, 909 So. 2d 840, 842 (Ala. App. 2005) (parent "is guilty of . . . [such] misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question" [internal quotation marks omitted]); *Evans* v. *McTaggart*, 88 P.3d 1078, 1079, 1083–84 (Alaska 2004) (parent unfit or parental custody clearly detrimental to welfare of child); *Murphy* v. *Markham-Crawford*, 665 So. 2d 1093, 1094 (Fla. App. 1995) (same), review denied, 675 So. 2d 928 (Fla. 1996); *Clark* v. *Wade*, 273 Ga. 587, 598, 544 S.E.2d 99 (2001) (physical harm or significant, long-term emotional harm); *Stockwell* v. *Stockwell*, 116 Idaho 297, 299–300, 775 P.2d 611 (1989) (parent patently unfit or has abandoned his child; or nonparent has custody of child for appreciable period of time and best interests of child dictate custody being placed with nonparent); *In re Guardianship of Williams*, 254 Kan. 814, 826, 869 P.2d 661 (1994) (parent must be unfit unless "highly unusual or extraordinary circumstances" demonstrate parental presumption has "no application"); *Davis* v. *Collinsworth*, 771 S.W.2d 329, 330 (Ky. 1989) (parental unfitness as shown by abuse, moral delinquency, abandonment, emotional or mental illness, or failure, for reasons other than poverty alone, to provide essential care of child); *In the Matter of Jeffrey G.*, 153 N.H. 200, 204, 892 A.2d 1234 (2006) (specific harm to child requires showing that parent is unfit as determined in either abuse and neglect proceeding or termination of parental rights proceeding); *Watkins* v. *Nelson*, 163 N.J. 235, 245, 748 A.2d 558 (2000) (parent's gross misconduct or unfitness or other "extraordinary circumstances" affecting welfare

The majority concludes that a different standard than *Roth* should apply in custody disputes because, unlike visitation, "the overall competence of the parent to care for the child is directly challenged in third party custody

of child—denial of petition would cause harm to child); *McDuffie v. Mitchell,* 155 N.C. App. 587, 591, 573 S.E.2d 606 (2002) (parent has engaged in "acts that would constitute 'unfitness, neglect, [or] abandonment,' or any other type of conduct so egregious as to result in defendant's forfeiture of his constitutionally protected status as a parent"), review denied, 357 N.C. 165, 580 S.E.2d 368 (2003); *Camburn v. Smith,* 355 S.C. 574, 579, 586 S.E.2d 565 (2003) (parental unfitness); *Ray v. Ray,* 83 S.W.3d 726, 732 (Tenn. App. 2001) (substantial harm, meaning "real hazard or danger that is not minor, trivial, or insignificant"); *Bailes v. Sours,* 231 Va. 96, 100, 340 S.E.2d 824 (1986) (parental unfitness, previous order of divestiture, voluntary relinquishment, abandonment or "special facts and circumstances . . . constituting an extraordinary reason for taking a child from its parent"); *In re Custody of Shields,* 157 Wash. 2d 126, 144–45, 136 P.3d 117 (2006) (extraordinary circumstances demonstrating actual detriment to child's growth and development); *In re E.G.,* 212 W. Va. 715, 719–20, 575 S.E.2d 325 (2002) (parent unfit because of misconduct, neglect, immorality, abandonment, or other dereliction of duty, or has waived such right, or by agreement or otherwise has permanently transferred, relinquished or surrendered such custody).

Although the majority suggests that some of these jurisdictions apply a standard that is comparable to the one it has adopted, it overlooks the fact that most of those jurisdictions have not held, as has the majority implicitly, that extraordinary circumstances means harm of a lesser degree than when a child "is being denied proper care and attention, physically, educationally, emotionally or morally, or . . . is being permitted to live under conditions, circumstances or associations injurious to the well-being of the child . . . ." General Statutes § 46b-120 (9) (B) and (C) (defining neglect). It also glosses over the fact that many of these jurisdictions apply a clear and convincing burden of proof. See footnote 12 of this concurring opinion.

I also note that, although some states do not provide specifically for statutory intervention by third parties in dissolution proceedings to obtain custody, as does Connecticut, a majority of states have considered the question of when it is proper for a court to award custody to a third party over a parent. That question may arise in any one of several contexts—a guardianship, dissolution or paternity proceeding or in some other context not expressly provided for by statute. Because in my view the constitutional limits on a state's ability to exercise its power to vest custody of a child in a third party over a parent's objection generally remain the same irrespective of which procedural vehicle is used to invoke the court's authority, I do not distinguish the states based on the particular procedure by which the third party may obtain custody.

petitions . . . ." I disagree. In *Roth*, this court rejected the possibility that something less than proof of the kind of harm akin to that contemplated by §§ 46b-120 and 46b-129, namely, that the child is "neglected, uncared-for or dependent" would provide a sufficient constitutional safeguard. *Roth* v. *Weston*, supra, 259 Conn. 225–26. Neglect is defined as, inter alia, circumstances wherein a child "is being denied proper care and attention, physically, educationally, emotionally or morally, or . . . is being permitted to live under conditions, circumstances or associations injurious to the well-being of the child or youth, or . . . has been abused." General Statutes § 46b-120 (9) (B) (C) and (D). Given that *Roth* requires a third party seeking visitation to prove real and substantial harm akin to that under our neglect statutes should the petition not be granted, one reasonably cannot say that the parent's competency is not at issue in visitation petitions. Accordingly, I would conclude that no lesser standard of constitutional protections than that which this court applied in *Roth* can apply to third party custody.

Turning to the parental presumption set forth in § 46b-56b, which requires a nonparent to show that parental custody would be "detrimental to the child," undoubtedly such a standard could be reconciled with *Roth*, depending on what detriment means. If "detriment" is construed to mean any degree of harm, no matter how insubstantial or short-lived, that standard readily could devolve to a best interests test, in contravention to the holdings of *Roth* and *Troxel*. See *Evans* v. *McTaggart*, 88 P.3d 1078, 1086–87 (Alaska 2004) (noting concern that detriment standard might not be readily distinguishable from best interest test). Such an open-ended term also could be construed to allow a third party to obtain custody solely because a child is suffering short-term emotional upheaval as a result of the dissolution of the parents' marriage or other disruptive

events. See *In re Jessica M.*, 217 Conn. 459, 470, 586
A.2d 597 (1991) ("[i]t is not unlikely that most parent-
child relationships in which state intervention is
required, including custody disputes incidental to
divorce, will exhibit signs of strain"). Detriment also
could be construed to mean the inculcation of values
and beliefs that are contrary to social norms. Cf. *Painter*
v. *Bannister*, 258 Iowa 1390, 1393–96, 140 N.W.2d 152
(citing disapproval of father's Bohemian lifestyle,
despite evidence of his care and concern for child and
view that grandparents' home provided "a stable, con-
ventional, middle-class, middlewest background" in
rationale for affirming award of custody to grandpar-
ents over father's objection), cert. denied, 385 U.S. 949,
87 S. Ct. 317, 17 L. Ed. 2d 227 (1966); see also *Santosky*
v. *Kramer*, supra, 455 U.S. 764 ("[a]n elevated standard
of proof . . . would alleviate the possible risk that a
factfinder might decide to [deprive] an individual based
solely on a few isolated instances of unusual conduct
[or] . . . idiosyncratic behavior" [internal quotation
marks omitted]). Thus, it is evident that some further
refinement of the term "detriment" is necessary to
ensure a uniform, constitutional application.

Mindful of such concerns, one of our sister states
applied the following judicial gloss to the detriment
standard: "Detriment refers to circumstances that pro-
duce or are likely to produce lasting mental, physical
or emotional harm. . . . [D]etriment [i]s more than the
normal trauma caused to a child by uprooting him from
familiar surroundings such as often occurs by reason of
divorce, death of a parent or adoption. It contemplates a
longer term adverse effect that transcends the normal
adjustment period in such cases. . . . Parental rights
do not evaporate merely because parents have not been
ideal parents." (Citations omitted; internal quotation
marks omitted.) *In re Marriage of Matzen*, 600 So. 2d

487, 490 (Fla. App. 1992). Undoubtedly, this gloss is entirely consistent with the *Roth* standard.

The majority implicitly recognizes the constitutional problems inherent in the vagueness of the term "detriment," by virtue of its numerous attempts to refine its meaning. The majority engrafts onto the "detriment" standard the following gloss: "damaging, injurious or harmful to the child," a definition of "detriment" previously cited by this court in *In re Joshua S.*, 260 Conn. 182, 207, 796 A.2d 1141 (2002); "exceptional circumstances"; not "temporary harm of the kind resulting from the stress of the dissolution proceeding itself, but significant harm arising from the pattern of dysfunctional behavior that has developed between the parent and the child over a period of time"; and a "qualitatively different [analysis] from that involving the 'best interests of the child' . . . ." In my view, these descriptive terms, in conjunction with the majority's rejection of the *Roth* standard, do little to guide the courts in properly balancing the interests at stake.

Specifically, the majority cites the court's statement in *In re Joshua S.*, supra, 260 Conn. 207, wherein we held that "detriment may be shown, not just by demonstrating unfitness . . . but by demonstrating considerations that would be damaging, injurious or harmful to the child." The majority ignores entirely, however, the context in which the court made this statement. The custody dispute in *In re Joshua S.* was between testamentary guardians and foster parents, a fact that led the court to reject the constitutional presumption afforded to parents and the applicability of the *Roth* and *Troxel* holdings to the case. Id., 203–205. Accordingly, the court did not examine the meaning of detriment through a constitutional lens; rather, it simply looked to the dictionary for the common meaning of the term. Id., 207 n.19, citing Webster's New World Dictionary (2d Ed.). Notably, in rejecting the testamen-

tary guardians' reliance on a pre-*Roth* case, *Doe* v. *Doe*, 244 Conn. 403, 455, 710 A.2d 1297 (1998), wherein the court had held that "[s]o long as due regard is given to the [parental] presumption . . . '[t]he best interests standard remains the ultimate basis of a court's custody decision,' " the court in *In re Joshua S.* stated: "In light of our recent decisions concerning third party visitation . . . *Roth* v. *Weston*, [supra, 259 Conn. 202]; *Crockett* v. *Pastore*, 259 Conn. 240, 789 A.2d 453 (2002); we now question the vitality of the standard as set out in *Doe* by which to rebut the presumption favoring a parent over a nonparent in a custody dispute." *In re Joshua S.*, supra, 202 n.17. Thus, *In re Joshua S.* does no more than provide a dictionary definition of the term "detriment" and acknowledge that this court's pre-*Roth* and pre-*Troxel* case law may have questionable precedential value in setting sufficient constitutional standards for third party custody disputes.[8]

The majority's addition of the qualifying term "exceptional circumstances" hardly provides meaningful guidance to the trial courts. Although some other

---

[8] This court's recognition in *In re Joshua S.* that *Roth* and *Troxel* signal a change in the legal landscape also undermines reliance on legislative intent as to the meaning of detriment. Although I do not agree with the majority that the legislative history demonstrates a rejection of the *Roth* standard of harm, because the focus of legislative debates preceding adoption of the parental presumption in § 46b-56b clearly was on the burden of proof, we cannot presume in any event that the legislature adopted the detriment standard fully mindful of the constitutional implications. The legislature amended § 46b-56b in 1986 to add the provision regarding the grounds for rebutting the parental presumption. See Public Acts 1986, No. 86-224. In light of the fact that, in 2000, this court in *Roth* overruled its 1994 holding in *Castagno* following the Supreme Court's 2000 decision in *Troxel*, we hardly could expect the legislature to be more prescient than this court in predicting constitutional developments. Moreover, even if the legislature had considered what the constitution demands, it clearly is the province of the court to determine whether a statutory standard passes constitutional muster. See *Office of the Governor* v. *Select Committee of Inquiry*, 271 Conn. 540, 574–75, 858 A.2d 709 (2004), citing *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803).

jurisdictions have used a similar term, many have used the term in conjunction with specific examples of harm to provide a contextual gauge for the requisite harm; many others have eschewed such an amorphous standard altogether in favor of a more fact specific inquiry or have declined to permit third party custody in the absence of parental unfitness. See footnote 7 of this concurring opinion. The majority at least limits the temporal nature of the harm, requiring something more than the temporary stress attendant to dissolution, but declines to tether the detriment standard to the contextual gauge provided by the *Roth* standard's time-tested application and its well understood contours.

The majority declines to do so because it finds the *Roth* standard lacking sufficient flexibility to address the myriad circumstances under which courts may need to intervene to protect children. It cites the possibility of some "unpredictable" significant harm that might fall short of the *Roth* standard, yet warrant removing a child from his or her parent's custody. I find this concern puzzling and troubling for several reasons. Contrary to the majority's suggestion, the definitions of neglected, uncared for and dependent are not limited to circumstances wherein the child's "actual safety may be . . . endangered." Indeed, the majority appears to equate the *Roth* standard with "abuse," rather than with the pertinent terms. Compare General Statutes § 46b-120 (4) (defining "abused") with General Statutes § 46b-120 (7), (9) and (10) (respectively, defining "dependent," "neglected" and "uncared for").[9] Thus, by con-

---

[9] General Statutes § 46b-120 provides the following relevant definitions: "(4) '[A]bused' means that a child or youth (A) has been inflicted with physical injury or injuries other than by accidental means, or (B) has injuries that are at variance with the history given of them, or (C) is in a condition that is the result of maltreatment such as, but not limited to, malnutrition, sexual molestation or exploitation, deprivation of necessities, emotional maltreatment or cruel punishment . . . (7) a child or youth may be found 'dependent' whose home is a suitable one for the child or youth, save for the financial inability of parents, parent, guardian or other person main-

cluding that some harm short of the *Roth* standard suffices, the majority necessarily determines that a lesser harm to the child than "being denied proper care and attention, physically, educationally, emotionally or morally, or . . . being permitted to live under conditions, circumstances or associations injurious to the well-being of the child or youth"; General Statutes § 46b-120 (9) (B) and (C); would be a constitutionally permissible basis on which to deprive a parent of custody. As I have discussed previously, the case law is to the contrary.

I am unaware of any criticism from our trial courts or the family law bar that our long-standing and expansively defined neglect standards have failed to meet the needs of the children of this state. Indeed, under our neglect statutes, the petitioner need not even allege and prove *actual* harm, only the genuine potential for real and substantial harm. See *In re Jermaine S.*, 86 Conn. App. 819, 831, 863 A.2d 720, cert. denied, 273 Conn. 938, 875 A.2d 43 (2005). Moreover, our trial courts are well versed in ascertaining the unique needs of each child and circumstances of each family even when determining the lesser standard of best interests of the child in family matters generally. See *Strohmeyer* v. *Strohmeyer*, 183 Conn. 353, 356, 439 A.2d 367 (1981) (noting "inherently fact-bound" inquiry in best interests of child determination).

I cannot accept the majority's premise that harm that falls short of the minimum threshold for an adjudication

---

taining such home, to provide the specialized care the condition of the child or youth requires . . . (9) a child or youth may be found 'neglected' who (A) has been abandoned, or (B) is being denied proper care and attention, physically, educationally, emotionally or morally, or (C) is being permitted to live under conditions, circumstances or associations injurious to the well-being of the child or youth, or (D) has been abused; (10) a child or youth may be found 'uncared for' who is homeless or whose home cannot provide the specialized care that the physical, emotional or mental condition of the child requires. . . ."

of neglect provides a constitutionally permissible basis for divesting a parent of custody in a third party custody petition. I have no doubt that trial courts will have difficulty drawing the line between detriment that falls short of neglect yet exceeds a mere best interests of the child determination. See *Evans* v. *McTaggart*, supra, 88 P.3d 1086–87 (noting concern that detriment standard might not be readily distinguishable from best interest test). Unlike the majority, I favor giving our trial courts a time-tested standard rather than inviting challenges to a more amorphous standard on a case-by-case basis. Moreover, I do not construe the Supreme Court's deference to state court standards to constitute its sanctioning of such vagaries.[10]

Undoubtedly, the more open-ended the standard, the more flexibility it allows. While flexibility may be a virtue in some circumstances, we are operating in the realm of constitutional rights, where concerns of vagueness and arbitrary application counsel against

[10] In my view, the majority misconstrues the Supreme Court's disinclination in *Troxel* v. *Granville*, supra, 530 U.S. 73, to reach the issue of whether a specific showing of harm constitutionally was required before a third party could obtain visitation over a fit parent's objection. The court's statement that, "[b]ecause much state-court adjudication in this context occurs on a case-by-case basis, we would hesitate to hold that specific nonparental visitation statutes violate the [d]ue [p]rocess [c]lause as a per se matter"; id.; simply reflects its well established policy of affording substantial deference to state courts in determining the contours of family law, an area of law traditionally relegated to the states. See *Elk Grove Unified School District* v. *Newdow*, 542 U.S. 1, 12, 124 S. Ct. 2301, 159 L. Ed. 2d 98 (2004) ("One of the principal areas in which this [c]ourt has customarily declined to intervene is the realm of domestic relations. Long ago we observed that '[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the [s]tates and not to the laws of the United States.' . . . So strong is our deference to state law in this area that we have recognized a 'domestic relations exception' that 'divests the federal courts of power to issue divorce, alimony, and child custody decrees.' . . . Thus, while rare instances arise in which it is necessary to answer a substantial federal question that transcends or exists apart from the family law issue . . . in general it is appropriate for the federal courts to leave delicate issues of domestic relations to the state courts." [Citations omitted.]).

amorphous standards. We adopted a standard in *Roth* that has provided both sufficient flexibility to meet the legitimate concerns of the child's well-being and sufficient constraints to protect the constitutional rights of the parent and family unit.

Therefore, consistent with our obligation to construe statutes to avoid constitutional infirmities; see *Clerk of the Superior Court* v. *Freedom of Information Commission*, 278 Conn. 28, 38–39, 895 A.2d 743 (2006); I would construe the "detrimental to the child" standard under § 46b-56b to mean harm of the same nature and degree as that required in § 46b-59 under *Roth*. Accordingly, I would conclude that a third party seeking custody must plead and prove real and substantial harm, akin to the kind of harm contemplated by §§ 46b-120 and 46b-129.

## II

I next turn to the issue of whether the heightened burden of proof prescribed in *Roth* similarly should apply to third party custody petitions. In *Roth*, this court concluded that the clear and convincing burden of proof was not constitutionally mandated in the context of third party visitation,[11] but that it nonetheless should apply because of the constitutional interest at stake

---

[11] In *Roth*, the court did not elaborate on the basis for its determination that due process did not mandate a heightened burden of proof, stating only: "We recognize that due process requires the clear and convincing test be applied to the termination of parental rights because it is the *complete severance* by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent; *Santosky* v. *Kramer*, supra, 455 U.S. 747–48; while abuse and neglect petitions require proof only by a preponderance of the evidence because 'any deprivation of rights [at that stage] is reviewable and nonpermanent and, thus, warrants a slightly less exacting standard of proof.' . . . *In re Shamika F.*, 256 Conn. 383, 401 n.22, 773 A.2d 347 (2001). It is evident, however, that in the visitation context, the heightened standard of clear and convincing evidence is not constitutionally mandated." (Emphasis in original.) *Roth* v. *Weston*, supra, 259 Conn. 231.

and the ease with which a third party with greater resources could intrude on that interest. *Roth* v. *Weston,* supra, 259 Conn. 231–32. In the context of a third party custody petition, however, I would conclude that the clear and convincing burden of proof is constitutionally mandated.

Although § 46b-56b does not state expressly by what degree of proof the parental presumption must be overcome, I agree with the majority that the legislative history to the statute indicates that the legislature declined to require that the courts apply the heightened burden of clear and convincing proof. As I previously have noted, however, given this court's evolving view of what the constitution mandates in third party visitation petitions, we reasonably could not expect the legislature to have been cognizant of such developments. See footnote 8 of this concurring opinion. Nonetheless, this court may impose a heightened burden of proof if the constitution so mandates. The majority concludes that the lowest possible burden of proof—preponderance of evidence—is constitutionally adequate because an award of custody differs from a proceeding to terminate parental rights in that custody: (1) involves the additional interest of the child's welfare; and (2) does not permanently sever parental rights. I disagree with this reasoning.

Specifically, the question before us is whether due process is violated by application of the preponderance of the evidence standard to a decision to award custody to a third party over a parent's objection, pursuant to General Statutes §§ 46b-56, 46b-56b and 46b-57, or whether due process mandates the more exacting standard of clear and convincing evidence. It is well settled that "[t]he function of a standard of proof, as that concept is embodied in the [d]ue [p]rocess [c]lause and in the realm of factfinding, is to instruct the factfinder concerning the degree of confidence our society thinks

he should have in the correctness of factual conclusions for a particular type of adjudication. . . . [I]n any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants." (Citations omitted; internal quotation marks omitted.) *Santosky* v. *Kramer*, supra, 455 U.S. 754–55. In stating its general rule, the Supreme Court noted that it "has mandated an intermediate standard of proof—clear and convincing evidence—when the individual interests at stake in a state proceeding are both particularly important and more substantial than mere loss of money. . . . Notwithstanding the state's civil labels and good intentions . . . the [c]ourt has deemed this level of certainty necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with a significant deprivation of liberty or stigma. . . . See, e.g., *Addington* v. *Texas*, [441 U.S. 418, 424, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979)] (civil commitment); *Woodby* v. [*Immigration & Naturalization Service*, 385 U.S. 276, 285, 87 S. Ct. 483, 17 L. Ed. 2d 362 (1966)] (deportation); *Chaunt* v. *United States*, 364 U.S. 350, 353 [81 S. Ct. 147, 5 L. Ed. 2d 120] (1960) (denaturalization); *Schneiderman* v. *United States*, 320 U.S. 118, 125, 159 [63 S. Ct. 1333, 87 L. Ed. 1796] (1943) (denaturalization)." (Citations omitted; internal quotation marks omitted.) *Santosky* v. *Kramer*, supra, 756–57.

I agree with the majority that the nature of the process due in a third party custody proceeding turns on the balancing of the following three distinct factors: "the private interests affected by the proceeding; the risk of error created by the [s]tate's chosen procedure; and the countervailing governmental interest supporting use of

the challenged procedure."[12] Id., 754. Applying those

---

[12] In recognition of the significance of the interest at stake, many states apply the clear and convincing burden of proof to a custody contest between a parent and a third party as a matter of legislative or judicial policy. See, e.g., Ariz. Rev. Stat. § 25-415 (B) (2007); Mich. Comp. Laws § 722.25 (2005); Minn. Stat. § 257C.03 (6) and (7) (2006); N.M. Stat. Ann. § 40-10B-8 (2006); Va. Code Ann. § 20-124.2 (B) (2004); *Evans* v. *McTaggart*, 88 P.3d 1078, 1079 (Alaska 2004); *Calle* v. *Calle*, 625 So. 2d 988, 990 (Fla. App. 1993); *Clark* v. *Wade*, 273 Ga. 587, 587–88, 544 S.E.2d 99 (2001); *In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind. 2002); *In re Guardianship of D.J.*, 268 Neb. 239, 247–49, 682 N.W.2d 238 (2004); *Watkins* v. *Nelson*, 163 N.J. 235, 249, 748 A.2d 558 (2000). As I discuss further in part II B of this concurring opinion, the Connecticut legislature also has determined that the clear and convincing burden of proof applies in a petition to remove a parent as guardian, the only proceeding other than a dissolution action in which a third party may seek custody.

Only a few courts, however, have addressed the question of what burden of proof is mandated by due process. There is no clear consensus among those courts, and, as a general matter, the courts summarily have reasoned either that the heightened burden of proof is mandated because of the significance of the constitutional interest at stake; see, e.g., *In the Matter of Guardianship of Blair*, Court of Appeals, Docket No. 2-950, 2003 WL 182981 at *5 (Iowa January 29, 2003); *Pittman* v. *Jones*, 559 So. 2d 990, 994 (La. App.), cert. denied, 565 So. 2d 451 (La. 1990); *In the Matter of R.A. & J.M.*, 153 N.H. 82, 98–101, 104, 891 A.2d 564 (2005); *In the Matter of R.A. & J.M.*, supra, 110 (Nadeau and Galway, Js., concurring in part and dissenting in part); *Bennett* v. *Hawks*, 170 N.C. App. 426, 428–29, 613 S.E.2d 40 (2005); *Ray* v. *Ray*, 83 S.W.3d 726, 733 (Tenn. App. 2001); *Paquette* v. *Paquette*, 146 Vt. 83, 92, 499 A.2d 23 (1985); or that the lesser burden is permissible because an award of custody is not necessarily a permanent deprivation of that interest. See *In re Custody of A.D.C.*, 969 P.2d 708, 710 (Colo. App. 1998); *In re Guardianship of Doe*, 106 Haw. 75, 77–79, 101 P.3d 684 (App. 2004); *In re Guardianship of Barros*, 701 N.W.2d 402, 408 (N.D. 2005); *In the Matter of the Marriage of Winczewski*, 188 Or. App. 667, 706 n.30, 72 P.3d 1012 (2003) (Deits, J., concurring), review denied, 337 Or. 327, 99 P.3d 291 (2004); *In the Matter of the Marriage of Winczewski*, supra, 758 n.4 (Brewer, J., dissenting). The only court to consider this question at length and to apply expressly all of the factors prescribed for such an inquiry by the United States Supreme Court in *Santosky* v. *Kramer*, supra, 455 U.S. 754, is the Maryland Court of Appeals, which concluded that application of the preponderance standard did not violate due process. See *Shurupoff* v. *Vockroth*, 372 Md. 639, 660, 814 A.2d 543 (2003). I do not find the reasoning of *Shurupoff* persuasive, however, because the court therein principally relies, as does the majority in the present case, on the fact that an award of custody is not equivalent to termination of parental rights. See id., 656–57. I do not read *Santosky* to stand for the proposition that the preponderance

three factors, the United States Supreme Court held that due process mandates the clear and convincing burden of proof in a proceeding to terminate parental rights. Id., 768–69. By contrast, this court held that due process is not violated by application of the preponderance of the evidence standard to either a petition by the state for temporary custody of a child; *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 295; a petition by the state to adjudicate a child neglected, uncared for or dependent; *In re Juvenile Appeal (84-AB)*, supra, 192 Conn. 263; or a third party petition for visitation. *Roth v. Weston*, supra, 259 Conn. 231. In order to gauge the requirements of due process in the present case, I consider where a third party custody petition falls within the spectrum of this precedent. To put that question in context, I begin by briefly summarizing the nature of proceedings at issue in these cases, and the reasoning for the particular burden of proof applied therein.

In Connecticut, the state may seek a summary or ex parte order for immediate temporary custody when: (1) a child is suffering from serious physical injury or serious physical illness or is in immediate physical danger from his surroundings; and (2) immediate removal from the home is necessary to ensure the child's safety. See General Statutes § 17-38a (e); *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 288–89

---

burden of proof constitutionally may be applied to any deprivation short of the complete and final destruction of parental rights. For the reasons set forth in part II C of this concurring opinion, I also disagree with the concern voiced by the Maryland Court of Appeals, which the majority opinion shares, that "if the standard of proof for rebutting [the parental] presumption is too high, it may well be the child who will suffer." Id., 658.

I also note that, to extent that the majority relies on dicta in *Lehrer* v. *Davis*, 214 Conn. 232, 238, 571 A.2d 691 (1990), for the proposition that this court already has concluded that a lesser standard of proof would be constitutionally permissible, the majority again appears to take an anachronistic view of third party intervention into family autonomy, unwilling to recognize the watershed effect of *Troxel* on this court's reevaluation of its jurisprudence in this area.

(construing § 46b-129 [b] to authorize immediate removal of child only under same circumstances as § 17-38a [e]). When immediate removal from the home is not necessary, but the child nonetheless may be neglected, uncared for or dependent, the state initiates a petition to adjudicate the child's status and to determine what disposition is appropriate. General Statutes § 46a-129 (a). Disposition options available to the court range from ordering supervised or unsupervised parental custody, to committing the child to the department of children and families (department) for a specified period of time, to vesting the child's care and personal custody to a suitable third person or agency. General Statutes § 46a-129 (j). If the child is committed to the department, the state thereafter may seek to continue the placement, to return the child to the parent or to terminate parental rights. General Statutes §§ 17a-111a and 46b-129 (k) (2). The termination of parental rights severs permanently the legal ties between parent and child. See General Statutes § 45a-707 (8) (" '[t]ermination of parental rights' means the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and the child's parent or parents so that the child is free for adoption except it shall not affect the right of inheritance of the child or the religious affiliation of the child").

Accordingly, in *Santosky* v. *Kramer*, supra, 455 U.S. 759, the Supreme Court determined that clear and convincing proof was required to terminate parental rights principally because the state's action resulted in the final and irrevocable destruction of the parent's fundamental right and numerous considerations combined to magnify the risk of erroneous deprivation of that right: imprecise subjective standards are applied by the court; litigation resources available to the state usually dwarf those of the parents; and no protections are available to bar repeated termination efforts. Id., 762–64. By

contrast, when this court determined that the preponderance standard was constitutionally adequate for temporary custody orders and neglect petitions, the court emphasized: that the interests of the child's safety would justify intervention in the family's autonomy if the child was suffering, or at imminent risk of suffering, serious physical harm; that the court had disposition options short of removing the child from the parent's custody; and that the court's decision was neither final nor irrevocable because it was subject to change via numerous statutorily prescribed stages of review. *In re Juvenile Appeal (84-AB)*, supra, 192 Conn. 263–64; *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 287–88, 291. With this background in mind, I turn to the three *Santosky* factors in the context of third party custody.

A

Under the first factor, the question of "[w]hether the loss threatened by a particular type of proceeding is sufficiently grave to warrant more than average certainty on the part of the factfinder turns on both the nature of the private interest threatened and the permanency of the threatened loss." *Santosky* v. *Kramer*, supra, 455 U.S. 758. The fundamental, constitutional dimension of the interest at stake when a child is removed from a parent's custody is well established. "[I]t [is] plain beyond the need for multiple citation that a natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." (Internal quotation marks omitted.) Id., 758–59; accord *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 284. As I have noted in part I of this concurring opinion, the constitutional interest, more broadly framed, is recognized as a right to family integrity or family autonomy that is held collectively by parent and child. See *Pamela B.* v. *Ment*, supra, 244 Conn. 310.

Although a custody proceeding also implicates another interest, that of the child's safety and well-being; see *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 287; I address that interest, to the extent that it conflicts with the child's interest in maintaining family integrity, when analyzing the third *Santosky* factor of the countervailing interest in a lesser burden of proof. I underscore at this juncture, however, my disagreement with what appears to be the equivalent weight given by the majority to the child's safety interest (or more accurately under the majority's standard, the child's interest in being protected from any degree of harm) and the constitutional interests of the parent and family unit. As noted previously, given the absence of authority holding that the child's general safety interest is of equal constitutional dimension to the child's interest in maintaining the integrity of the family unit and to the parent's rights; *DeShaney* v. *Winnebago County Dept. of Social Services*, supra, 489 U.S. 201; see *Teresa T.* v. *Ragaglia*, supra, 272 Conn. 760 n.16; I would conclude that the constitutional rights should be the paramount concern in determining the proper burden of proof. See *Santosky* v. *Kramer*, supra, 455 U.S. 760–61 ("At the fact-finding, the [s]tate cannot presume that a child and his parents are adversaries. After the [s]tate has established parental unfitness at that initial proceeding, the court may assume at the dispositional stage that the interests of the child and the natural parents do diverge. . . . But until the [s]tate proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship. Thus, at the factfinding, the interests of the child and his natural parents coincide to favor use of error-reducing procedures." [Citation omitted.]); see also *In re Juvenile Appeal (83-CD)*, supra, 287 (state's interest in child's safety becomes paramount only when serious physical injury or illness is found or when immediate physical danger is present).

Turning to the extent of the deprivation, it is clear that a successful third party custody petition does not necessarily deprive a parent of all parental rights nor of custody permanently. Nonetheless, as explained in part I of this concurring opinion when contrasting the effect of a visitation petition with that of a custody petition, during the period that a parent is deprived of full custody, his or her rights vis-á-vis the child may bear substantial similarities to those of a parent whose rights have been terminated. Indeed, an award of custody can undermine family integrity irreparably. As emphasized previously, an award of full custody to a third party deprives the parent of the most essential attributes of parenthood—the right to make decisions affecting the child's development, such as determining the child's associations, education and medical treatment and the right to inculcate religious beliefs and moral values. See *Wisconsin* v. *Yoder*, supra, 406 U.S. 232–33; *Roth* v. *Weston*, supra, 259 Conn. 216–17. Indeed, as the present case clearly demonstrates, a court granting a third party custody petition may not leave the parent with any decision-making authority with respect to the child, and may not order meaningful visitation.[13]

The Supreme Court has recognized that even a temporary deprivation of a constitutional right may require a heightened burden of proof to assure the correctness of the judgment. See *Santosky* v. *Kramer*, supra, 455 U.S. 759. Indeed, the court's decision in *Addington* v. *Texas*, supra, 441 U.S. 422, in which the court deter-

---

[13] In the present case, under the trial court's order, the defendant has no authority to render decisions on any major events affecting his child's life, only the right of consultation with the intervening paternal aunt, Husaluk, in whom the court vested custody and final authority on all such matters. Although the court ordered that the child return to Connecticut during her breaks from school, the order provides only that she is to be "encouraged" to spend equal visitation time with her parents and that she may decline to stay overnight with the defendant.

mined that the clear and convincing burden was required in a civil commitment proceeding, is one such example. As a result of that proceeding, the appellant had been committed involuntarily to a state mental hospital for an indefinite period. Id., 420–21. The court concluded that the heightened burden was required even though, under Texas law, the appellant had the right to treatment, periodic review of his condition, and immediate release when he no longer was deemed to be a danger to himself or to others. Id., 422.

This court has understood that a temporary deprivation of a parent's constitutional right to care and custody of his or her child gives rise to a risk of such irreparable harm that it has deemed interlocutory orders affecting that interest final judgments for purposes of appeal. See *Sweeney* v. *Sweeney*, 271 Conn. 193, 208–10, 856 A.2d 997 (2004) (pendente lite order related to religious and educational upbringing of minor child); *In re Shamika F.*, 256 Conn. 383, 405–406, 773 A.2d 347 (2001) (order of temporary custody pursuant to neglect statute); *Taff* v. *Bettcher*, 243 Conn. 380, 386–87, 703 A.2d 759 (1997) (judicially imposed one year ban on review of custody and visitation issues); *Madigan* v. *Madigan*, 224 Conn. 749, 756–58, 620 A.2d 1276 (1993) (order of temporary physical custody in dissolution action). As this court explained with respect to a court order imposing a one year filing ban on parties to a dissolution action, such an order "may interfere with a parent's custodial rights over a significant period in a manner that cannot be redressed at a later time. A lost opportunity to spend significant time with one's child is not recoverable. . . . Any chance by the noncustodial parent to restructure custody and visitation to enhance the relationship or further establish a foundation in that interval cannot be replaced by a subsequent modification one year later. Nor can any harm to the child caused by the custodial arrangement be

meaningfully addressed one year after it occurs." (Citation omitted.) *Taff* v. *Bettcher*, supra, 387. Indeed, this court has recognized that actions undertaken while the child is removed from the parent's custody may have a long lasting effect on the child and the parent-child relationship even if parental custody thereafter is restored.[14] See *Sweeney* v. *Sweeney*, supra, 211.

Thus, the fact that a parent later may seek to regain custody by filing a motion for modification of the judgment does not diminish substantively the constitutional significance of the deprivation of the interest at stake. Indeed, this court determined that the lesser preponderance burden was permissible for neglect proceedings in part because the dispositional options available to the court included keeping the child in the parent's custody. *In re Juvenile Appeal (84-AB)*, supra, 192 Conn. 263; *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 288. Accordingly, the first factor weighs in favor of the heightened clear and convincing standard of the burden of proof.

---

[14] As this court recently explained in *Sweeney* v. *Sweeney*, supra, 271 Conn. 211, wherein at issue was an order permitting a minor child to attend a parochial school against one parent's wishes: "The lost opportunity to have a child exposed only to academic and religious influences sanctioned by a joint legal custodian cannot be replaced by any subsequent court order. Moreover, such a pendente lite order may impact this parental right over a significant period of time, with the harm to the parental interest increasing exponentially as the minor child spends more time in the educational institution at issue. Subsequent attempts by an aggrieved parent to modify such a pendente lite order also may not be an adequate substitute for vindication of the parent's rights through an appeal. Finally, a pendente lite order such as this may result in a spillover effect with regard to subsequent decisions related to the enrollment of the minor child. Charged with the determination as to what is in the best interests of the minor child, the trial court may later be reluctant to create a degree of instability in the daily life of the minor child, and adversely impact personal bonds created with teachers and classmates, by ordering the transfer of the minor child to another educational institution."

B

Turning to the second factor, "we next must consider both the risk of erroneous deprivation of private interests resulting from use of a 'fair preponderance' standard and the likelihood that a higher evidentiary standard would reduce that risk. . . . Since the [third party] proceeding is an adversary contest between the [third party] and the . . . parents, the relevant question is whether a preponderance standard fairly allocates the risk of an erroneous factfinding between these two parties." (Citation omitted.) *Santosky* v. *Kramer*, supra, 455 U.S. 761.

*Santosky* raised some specific concerns as to the risk of erroneous deprivation in a termination proceeding. One of these concerns, the imbalance of resources to litigate the action, is not implicated in a meaningful way when the state is not a party to the proceeding. Private litigants always face the risk that they may have to defend against a party with greater resources. Other concerns raised in *Santosky*, however, are implicated in the present case. As I have explained in part I of this concurring opinion, the detriment standard adopted by the majority leaves the adjudication unusually open to the subjective values of the judge. Indeed, this court has recognized that such problems may arise even under the more specific neglected, dependent and uncared for standard under §§ 46b-120 and 46b-129. See *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 292 ("[p]etitions for neglect and for temporary custody orders, like the petitions to terminate parental rights . . . are particularly vulnerable to the risk that judges or social workers will be tempted, consciously or unconsciously, to compare unfavorably the material advantages of the child's natural parents with those of prospective adoptive parents [or foster parents]" [citations omitted; internal quotation marks omitted]). This subjectivity is magnified when these standards are applied to a third party cus-

tody petition because the court lacks the concomitant obligation that it has when the state initiates a neglect petition to delineate the specific deficiencies that the parent must remedy to regain custody. See General Statutes § 46b-129 (b) and (d).

Additionally, as in termination proceedings, there is no double jeopardy or other doctrinal bar to protect a parent from a third party's repeated efforts to relitigate the custody issue. Cf. *Rivera* v. *Minnich*, 483 U.S. 574, 582, 107 S. Ct. 3001, 97 L. Ed. 2d 473 (1987) (concluding that finality of judgment in paternity suit weighs in favor of preponderance standard). Although a third party can intervene only in an existing custody controversy before the court; see General Statutes § 46b-57; it is not uncommon for numerous such controversies to come before the court over a period of years.[15] See, e.g., *Taff* v. *Bettcher*, supra, 243 Conn. 382–83 (after 1994 dissolution judgment, defendant filed motions relating to custody and visitation in 1995 and 1996); *Janik* v. *Janik*, 61 Conn. App. 175, 176–77, 763 A.2d 65 (2000) (after 1995 dissolution judgment, plaintiff moved to modify custody in 1997 and 1998), cert. denied, 255 Conn. 940, 768 A.2d 949 (2001); see also *Strobel* v. *Strobel*, 92 Conn. App. 662, 663, 886 A.2d 865 (2005) (in eight years since dissolution action, plaintiff father had filed 111 motions, and defendant mother had filed 119 motions); *Berglass* v. *Berglass*, 71 Conn. App. 771, 774, 804 A.2d 889 (2002)

---

[15] Thus, I disagree both as a matter of fact and logic with the majority's contention that a lesser standard of proof is warranted because "§ 46b-57, unlike the visitation statute, permits third party intervention only in an existing controversy before the court." This reasoning appears to resurrect the precise logic that this court rejected in *Roth* v. *Weston*, supra, 259 Conn. 212, when it overruled the holding in *Castagno*, wherein this court previously had attempted to remedy the constitutional concerns by construing § 46b-59 "to afford the trial court jurisdiction to entertain a petition for visitation only when the minor child's family life has been disrupted in a manner analogous to the situations addressed by [the custody statutes] §§ 46b-56 and 46b-57." *Castagno* v. *Wholean*, supra, 239 Conn. 352.

(in two years prior to 1998 judgment of dissolution, there were 124 docket entries; during postjudgment years of 1998 and 1999, there were forty-six entries).

Other concerns that were not implicated in *Santosky*, however, arise in third party custody proceedings that demonstrate that the preponderance standard creates a substantial risk of erroneous deprivation of the right to family integrity. Specifically, although this court concluded that an adjudication of neglect, uncared for or dependent under §§ 46b-120 and 46b-129 requires only proof by a preponderance of the evidence, the different effect of, and protections attendant to, that state initiated proceeding underscores why the preponderance standard is inadequate to prevent error in third party custody petitions.

First, a neglect adjudication under § 46b-129 does not result necessarily in an order depriving the parent of custody, a factor that we have deemed constitutionally significant. See, e.g., *In re Juvenile Appeal (84-AB)*, supra, 192 Conn. 261; *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 288. If the facts demand the less preferable option of removing the child from the home, the focus of the state's efforts subsequent to that disposition is to enhance the possibility of reunification of the family. See General Statutes § 17a-111b; *In re Devon B.*, 264 Conn. 572, 581–82, 584, 825 A.2d 127 (2003); *In re Juvenile Appeal (84-AB)*, supra, 258. There are numerous procedural protections prescribed to meet that goal. See generally Practice Book c. 32a (setting forth rights of parties to neglect and termination proceedings); Practice Book c. 35a (prescribing procedures for hearing concerning neglected, uncared for and dependent children). The court must provide to the parent specific steps he or she must take in order to regain custody. General Statutes § 46b-129 (b) and (d); see, e.g., *In re Ebony H.*, 68 Conn. App. 342, 344, 789 A.2d 1158 (2002). The court also provides to the depart-

ment the specific steps that it must take to provide the parent with support services reasonably necessary to accomplish reunification. General Statutes § 46b-129 (b) and (d); see *In re Devon B.*, supra, 589 (*Zarella, J.*, dissenting) ("the 'specific steps' provisions of § 46b-129 have two purposes: first, to instruct the parent on the specific conduct in which he or she must engage in order to satisfy the petitioner and the trial court that he or she is a fit parent and, second, to ensure that the petitioner does what it reasonably can to facilitate, rather than to impede, reunification"). Indeed, this court recently recognized that the courts may use their civil contempt power to ensure that the department meets these obligations, which are predicated on the constitutional interests at stake. See *In re Leah S.*, 284 Conn. 685, 696–97, 935 A.2d 1021 (2007). The decision to deprive the parent of custody is subject to specified, periodic judicial review to ensure that the department is making reasonable efforts to advance this goal.[16] See General Statutes § 46b-129 (b), (j) and (k). Finally, throughout these proceedings, the parent is entitled to

---

[16] The court must determine within sixty days after issuing an ex parte temporary custody order or committing the child to the department's custody whether the department has made reasonable efforts to keep the parent with the child prior to the issuance of the court's order. General Statutes § 46b-129 (b) and (j). Nine months after an order of commitment, the commissioner of children and families (commissioner) must file a motion for review of a permanency plan for the child. General Statutes § 46b-129 (k) (1). The permanency plan may recommend family reunification, with or without supervision. General Statutes § 46b-129 (k) (2) (B). Nine months after the permanency plan is approved, the commissioner must file a motion for review of the plan, and a hearing must be held within ninety days after the motion is filed. General Statutes § 46b-129 (k) (1). After an initial permanency hearing, subsequent permanency hearings must be held at least every twelve months as long as the child remains in custody of the department. General Statutes § 46b-129 (k) (1). The commissioner can avoid its obligation to reunify the child with the parent if the court determines, by clear and convincing evidence, that the parent has subjected the child to certain aggravated circumstances, such as sexual or physical abuse. General Statutes § 17a-111b (b).

appointed counsel if he or she cannot afford one. General Statutes §§ 46b-129 (b) and (d), and 46b-135 (b).

By contrast, in a third party custody petition, the sole relief sought by the party initiating the proceeding is to remove the child from the parent's custody. Neither the state nor third party has any obligation to aid in the reunification of the family. The parent is not entitled to the procedural protections to which he or she would have been entitled had the state, rather than a third party, alleged that the child was neglected, uncared for or dependent.[17] This court has cited such protections as significant in determining whether due process has been satisfied. See *In re Juvenile Appeal (84-AB)*, supra, 192 Conn. 263–64; *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 288–91, 299–300; see also *In re Devon B.*, supra, 264 Conn. 589 (*Zarella, J.*, dissenting) ("[t]hese provisions are designed to ensure that [the] department takes 'appropriate measures . . . to secure reunification of parent and child' . . . so that the parent's fundamental right to family integrity is not violated" [citation omitted]). Although procedural protections will not obviate necessarily the need for a heightened burden of proof; see, e.g., *Santosky* v.

---

[17] The majority points to chapter 25 of the Practice Book and asserts that "many of the due process protections in chapters 32a and 35a of the Practice Book accorded the parents of a child in a neglect or termination proceeding, including the right to a hearing, are provided in a custody proceeding." Chapter 25 does not, however, provide for appointment of counsel for parents contesting custody. It provides for appointment of counsel for the minor child; Practice Book § 25-24; appointment of counsel in civil contempt proceedings related to family matters; Practice Book § 25-63; and appointment of counsel in state initiated paternity actions. Practice Book § 25-68; see also *Foster* v. *Foster*, 84 Conn. App. 311, 320, 853 A.2d 588 (2004) (parent has no constitutional right to counsel in custody or visitation proceedings).

The majority also posits that certain broadly phrased permissive provisions of our General Statutes and rules of practice applicable to custody "might" prompt a trial court to issue specific steps to aid reunification efforts following an order of third party custody. There is, however, no mandate to do so.

*Kramer*, supra, 455 U.S. 748–49 (citing procedural protections provided under New York's permanent neglect statutes); the absence of such protections does weigh in favor of a burden of proof that decreases the risk of error.

The majority points to the fact that one possible disposition under our neglect statutes is an order vesting custody in a "suitable and worthy" third person; see General Statutes § 46b-129 (j); and rationalizes that, because this court had held in a 1985 opinion that periodic judicial review is not required in such circumstances; see *In re Juvenile Appeal (85-BC)*, 195 Conn. 344, 361, 488 A.2d 790 (1985); the absence of such protections should not bear on the issue before us. The majority assumes too much. Our appellate courts never have considered whether a court is authorized under the statute to vest custody with a third party *directly* following an adjudication of neglect without providing the procedural protections otherwise prescribed under § 46b-129, nor have our courts considered whether the *constitution* mandates application of those procedural protections even if the child is transferred from the custody of the commissioner of children and families (commissioner) to a third party. In *In re Juvenile Appeal (85-BC)*, supra, 345–48, the court simply addressed the question of "whether, under . . . § 46b-129, the commissioner . . . must petition to extend a commitment of custody of two minor children, who had been adjudicated neglected, when their custody was committed originally to the commissioner but subsequently had been transferred to their paternal grandmother . . . ." In that case, the court considered a pure question of statutory construction, expressly basing its conclusion on the fact that the statute requires a motion to extend commitment only when the commissioner assumes custody, and the court emphasized certain "critical" facts of the particular case, namely, that the

custody of the children had been transferred from the commissioner to the grandparents fifteen months after the commissioner had filed a neglect petition and eight months after the court had committed the children to the commissioner. Id., 349–50. The court never stated that reunification efforts and the attendant measures are not required if a court vests custody in a third party following an adjudication of neglect.

Notably, the only other mechanism available to a third party seeking to deprive a parent of custody is by way of an application to have the parent removed as guardian. See General Statutes § 45a-610.[18] Guardian-

---

[18] General Statutes § 45a-610 provides: "If the Court of Probate finds that notice has been given or a waiver has been filed, as provided in section 45a-609, it may remove a parent as guardian, if the court finds by clear and convincing evidence one of the following: (1) The parent consents to his or her removal as guardian; or (2) the minor child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility for the minor child's welfare; or (3) the minor child has been denied the care, guidance or control necessary for his or her physical, educational, moral or emotional well-being, as a result of acts of parental commission or omission, whether the acts are the result of the physical or mental incapability of the parent or conditions attributable to parental habits, misconduct or neglect, and the parental acts or deficiencies support the conclusion that the parent cannot exercise, or should not in the best interests of the minor child be permitted to exercise, parental rights and duties at the time; or (4) the minor child has had physical injury or injuries inflicted upon the minor child by a person responsible for such child's health, welfare or care, or by a person given access to such child by such responsible person, other than by accidental means, or has injuries which are at variance with the history given of them or is in a condition which is the result of maltreatment such as, but not limited to, malnutrition, sexual molestation, deprivation of necessities, emotional mal-treatment or cruel punishment; or (5) the minor child has been found to be neglected or uncared for, as defined in section 46b-120. If, after removal of a parent as guardian under this section, the minor child has no guardian of his or her person, such a guardian may be appointed under the provisions of section 45a-616. Upon the issuance of an order appointing the Commissioner of Children and Families as guardian of the minor child, or not later than sixty days after the issuance of such order, the court shall make a determination whether the Department of Children and Families made reasonable efforts to keep the minor child with his or her parents prior to the issuance of such order and, if such efforts were not made, whether such

ship bears substantial similarities to legal and physical custody. See *In re Juvenile Appeal (85-BC)*, supra, 195 Conn. 365 ("the ultimate effect of a custody-guardianship vested by the Superior Court in a 'suitable and worthy' third party pursuant to [§ 46b-129 (j)] may be identical to that rendered by an appointment of guardianship made by the Probate Court"); see also General Statutes § 45a-707 (4) (" '[g]uardianship' means guardianship, unless otherwise specified, of the person of a minor and refers to the obligation of care and control, the right to custody and the duty and authority to make major decisions affecting the minor's welfare, including, but not limited to, consent determinations regarding marriage, enlistment in the armed forces and major medical, psychiatric or surgical treatment"). Just as a parent may seek to regain custody through a motion for modification, a parent may seek to be reinstated as guardian. See General Statutes § 45a-611. A third party seeking custody via a guardianship petition must fall within a limited class of persons granted standing; General Statutes § 45a-614; and must prove harm akin to that required under the neglect statute. See footnote 18 of this concurring opinion. The third party, however, must prove the requisite harm by clear and convincing evidence. General Statutes § 45a-610. Accordingly, if the preponderance standard were to apply to a third party custody petition, the risk of erroneous deprivation of parental custody would be greater than if the state had initiated a neglect proceeding, wherein the preponderance burden applies but the parent receives substantial procedural protections, and greater than if a third party had initiated a guardianship proceeding, wherein

reasonable efforts were not possible, taking into consideration the minor child's best interests, including the minor child's health and safety."

As the statute indicates, if the commissioner is appointed as guardian, rather than a private party, the department still has the obligation to make reasonable efforts to reunify the family, if possible.

the heightened burden applies but fewer procedural protections are provided.[19]

"Given the weight of the private interests at stake, the social cost of even occasional error is sizable. Raising the standard of proof would have both practical .and symbolic consequences. Cf. *Addington* v. *Texas*, [supra, 441 U.S. 426]. The [Supreme] Court has long considered the heightened standard of proof used in criminal prosecutions to be 'a prime instrument for reducing the risk of convictions resting on factual error.' *In re Winship*, 397 U.S. [358, 363, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)]. An elevated standard of proof . . . would alleviate 'the possible risk that a factfinder might decide to [deprive] an individual based solely on a few isolated instances of unusual conduct [or] . . . idiosyncratic behavior.' *Addington* v. *Texas*, [supra, 427]. 'Increasing the burden of proof is one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropriate' [deprivations of parental custody] will be ordered." *Santosky* v. *Kramer*, supra, 455 U.S. 764–65. Accordingly, the second factor weighs in favor of the clear and convincing burden of proof.

## C

Finally, I turn to the third factor, the countervailing governmental interest supporting use of the challenged procedure. *Santosky* v. *Kramer*, supra, 455 U.S. 766, identified two interests that also are relevant here: "a parens patriae interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such pro-

[19] The parent is entitled to appointed counsel in a guardianship proceeding. General Statutes § 45a-609 (b). If the commissioner, rather than a third party, is appointed as guardian, the court must determine whether reasonable efforts were made to keep the child with the parent before the court issued the order. General Statutes § 45a-610.

ceedings. A standard of proof more strict than preponderance of the evidence is consistent with both interests."[20]

Although the state is not a party to a third party custody proceeding, in light of the substantial relationship that must be established by the third party, I would view the third party intervening in a custody dispute as representing the state's interest in protecting the child's welfare. This court has concluded, however, that it is only when serious physical harm or immediate danger is present, "that the child's interest no longer coincides with that of the parent, thereby diminishing the magnitude of the parent's right to family integrity . . . and therefore the state's intervention as parens patriae to protect the child becomes so necessary that it can be considered paramount." (Citation omitted.) *In re Juvenile Appeal (83-CD)*, supra, 189 Conn. 287–88. Moreover, although the child's interests in family integrity and his welfare are in equipoise in a neglect proceeding; *In re Juvenile Appeal (84-AB)*, supra, 192 Conn. 263–64; that balance exists because the court has available to it a range of disposition options that correlate directly to the risk to the child and the parent's ability to meet the child's needs. Thus, under our neglect statutes, even though a child has been found to be neglected, uncared for or dependent, the proper disposition nonetheless may be to keep the family unit intact. Id., 263. Indeed, due process requires that steps short of removal be undertaken when possible in preference to disturbing the family integrity. *In re Juvenile Appeal (83-CD)*, supra, 288; see also *Pamela B.* v. *Ment*, supra, 244 Conn. 313 ("[a]lthough a child's physical and emo-

---

[20] Thus, contrary to the majority's statement, the Supreme Court recognized that more than the parent's interest is at stake in termination proceedings, specifically, the child's welfare, but nonetheless concluded that the child's interest, to the extent that it might diverge from the parent's interest, adequately was protected by the heightened burden of proof.

tional well-being outweighs the interest in preserving the family integrity, the disruption of a child's family environment should not be extended beyond what is unequivocally needed to safeguard and preserve the child's best interests"). The child's dual interests in family integrity and personal welfare are not in equipoise, however, when a third party seeks custody because a successful third party petition can result only in removal of the child and does so even in the absence of imminent danger to the child.

The interest in protecting the child's welfare does not mandate the lesser preponderance burden of proof. In the rare case in which there is proof by a preponderance of the evidence, but not clear and convincing evidence, that denial of the third party custody petition would result in real and substantial harm to the child, the court still has authority to take action to protect the child. The court could bring the department into the action and either order supervised parental custody or commit the child to the department. In so doing, the court would trigger the full panoply of the procedural protections attendant to neglect proceedings to promote family integrity. The majority's concern that our trial courts would not take remedial action to ensure some oversight of the child in the rare case wherein the petitioner has proved by a preponderance of the evidence, but not clear and convincing evidence, that a child is at risk of serious harm is, quite simply, unfair to our trial courts. I have full faith that our trial courts would not look the other way should such a case be presented. Thus, application of the heightened burden of proof to third party custody petitions would prevent the erroneous deprivation of family autonomy without increasing the risk that the child could be exposed to serious harm. Cf. *Rivera* v. *Minnich*, supra, 483 U.S. 581 (Concluding that the preponderance standard was proper because "in a paternity suit the principal adver-

saries are the mother and the putative father, each of whom has an extremely important, but nevertheless relatively equal, interest in the outcome. Each would suffer in a similar way the consequences of an adverse ruling; thus, it is appropriate that each share roughly equally the risk of an inaccurate factual determination."). Accordingly, the heightened burden of proof properly balances the interests in both family integrity and the child's safety.

As the court noted in *Santosky* v. *Kramer*, supra, 455 U.S. 766–67, "[s]ince the [s]tate has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision at the factfinding proceeding. . . . As parens patriae, the [s]tate's goal is to provide the child with a permanent home. . . . Yet while there is still reason to believe that positive, nurturing parent-child relationships exist, the parens patriae interest favors preservation, not severance, of natural familial bonds. . . . [T]he [s]tate registers no gain towards its declared goals when it separates children from the custody of fit parents." (Citations omitted; internal quotation marks omitted.)

Finally, I note that the state's administrative and fiscal burdens also do not weigh in favor of the lesser burden of proof. Our trial judges, and in particular family court judges, are well versed in the application of the clear and convincing standard in numerous other contexts. See, e.g., General Statutes §§ 17a-78 and 17a-80 (hospitalization of child with mental disorder); General Statutes §§ 17a-111b, 17a-112 and 45a-717 (termination of parental rights); General Statutes § 45a-610 (removal of parent as guardian); General Statutes § 45a-650 (appointment of conservator); General Statutes § 45a-676 (appointment of plenary guardian for mentally retarded person); General Statutes § 46b-129 (termination of department's duty to make reasonable efforts to reunify family).

Balancing the three aforementioned factors, the logical conclusion is that due process requires application of the clear and convincing burden of proof. "The reason for adopting this heightened burden of proof in custody disputes between a biological parent and a third party is the same as the reason for adopting a heightened standard in termination of parental rights cases. The state and federal constitutions require a heightened standard because of the possible effects the proceeding might have on a biological parent's parenting rights. . . . To prevent unwarranted termination or interference with a biological parent's parenting rights, the grounds for judicial action must be established by clear and convincing evidence. . . . Evidence that satisfies this heightened burden of proof eliminates any serious or substantial doubt concerning the correctness of the conclusion to be drawn from the evidence . . . . It should produce in the fact-finder's mind a firm belief or conviction regarding the truth of the allegations sought to be established." (Citations omitted.) *Ray* v. *Ray*, 83 S.W.3d 726, 733 (Tenn. App. 2001). Therefore, in accordance with this court's obligation to construe statutes to avoid constitutional defects, I would conclude that a third party seeking to intervene in a custody proceeding must allege and prove, by clear and convincing evidence: (1) a relationship with the child that is similar to a parent-child relationship; and (2) real and substantial harm to the child akin to that under §§ 46b-120 and 46b-129 should the court deny the petition.

Accordingly, I respectfully concur in the judgment.